## Commonwealth *v.* Western Union Telegraph Company, Appellant.

Argued May 24, 1960. Before JONES, C. J., MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Rex Rowland,* with him *James D. Morton, John H. Waters,* and *Buchanan, Ingersoll, Rodewald, Kyle & Buerger,* for appellant.

*Robert A. Enders,* with him *Michael Edelman,* for Commonwealth, appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 29, 1960:

The Western Union Telegraph Company, which is a New York corporation, operates in Pennsylvania, as it does in all States of the Union. In the course of its business it collects money for transmission to other places by means of telegraphic money orders, that is to say, a sender deposits so much money at the sending office and the Western Union telegraphs to the office geographically closest to the address of the payee an order to pay the payee the amount specified by the payor. It sometimes occurs, however, because of the uncertainties of life, with its untoward happenings including accidents, earthquakes, fires, sudden removals, and even death, that the designated payee never gets the money telegraphed to him, in which event the sending Western Union office is so notified and it then pays the money back to the original depositor.

But unexpected happenings transpire even at the sender's end and, as a result of accident, earthquake, fire, or even death, the Western Union sending office is thus unable to return the money it had accepted for transmission. What happens to this money after sufficient time has elapsed to warrant the assumption that the sender will never turn up to collect back his money? The Western Union Telegraph Company answers this

question with the flat statement that it is entitled to the money.

If there were no declared law on the subject, some color of right would attach to the Western Union's claims because, in the absence of an established potentially-collecting owner, the possessor of property, through discovery, finding or otherwise, obviously can hold it against the world. However, there is no vacuum in the law for a situation of this kind. The Legislature of Pennsylvania has specifically provided that:

"(b) Whensoever the owner, beneficial owner of, or person entitled to any real or personal property within or subject to the control of the Commonwealth or the whereabouts of such owner, beneficial owner or person entitled, has been or shall be and remain unknown for the period of seven successive years, such real or personal property, together with the rents, profits, accretions and interest thereof or thereon, shall escheat to the Commonwealth.

"(c) Whensoever any real or personal property within or subject to the control of the Commonwealth has been or shall be and remain unclaimed for the period of seven successive years, such real or personal property, together with the rents, profits, accretions and interest thereof or thereon, shall escheat to the Commonwealth." (Escheat Act of 1889, May 2, 1889, P. L. 66, §3) as amended by the Act of 1953, July 29, P. L. 986, §1 (27 P.S. §333).

Proceeding under this statute, the Commonwealth of Pennsylvania, through its Secretary of Revenue, appointed Sidney Gottlieb, Esq., of Pittsburgh, as Escheator to collect outstanding sums such as those involved in this case. Accordingly, on December 21, 1953, Mr. Gottlieb filed in the Court of Common Pleas of Dauphin County a petition for escheat of certain sums in the hands of the Western Union Telegraph Company

which for seven years had remained unclaimed by their original owners. The Western Union Telegraph Company denied the right of the Commonwealth to escheat under the circumstances, and a hearing was scheduled in the court of common pleas. Before the hearing, however, the parties agreed on a stipulation of facts which was filed April 18, 1958. After due consideration of the agreed-on facts, assisted by arguments of the contending parties, the court on July 6, 1959, found for the Commonwealth in the sum of $39,857.74, the amount in controversy. Western Union appealed.

The Western Union contests the lower court's findings on three bases: (1) The Commonwealth's petition does not designate any property of Western Union which is within or subject to the control of the Commonwealth; (2) A decree in Escheat will not protect Western Union from future claims; (3) The notice given by the Commonwealth does not meet the requirements of due process.

The respondent Western Union says in its brief that the petition for escheat is "directed solely to the money which was paid by the senders but as to which Western Union was unable either to make payment in money to the persons to whom the senders had instructed payment to be made or to refund the money to the sender," and then argues that "these sums of money are not in Pennsylvania." The respondent points out that it is not per se a financial institution; that it is a telegram-transmitting organization and that it did not at any time during the period covered by the petition in escheat, or at any time, have fiscal or sub-fiscal agencies in Pennsylvania.

It emphasizes that the money paid by the sender in any particular transaction was not held isolatedly from other moneys and was not earmarked as belonging to the particular person who had deposited it for transmis-

sion to another person. The money was placed in a cash drawer and there it intermingled with money collected for telegrams and with other receipts. Thus, the respondent submits, it is impossible for the Court to point its finger to any specific "money" and say that this is the money which a sender deposited and which now has been unclaimed for seven years.

This argument almost approaches a play in semantics. It would be difficult to find a more generic term than *money*. When a lender approaches a person to whom he made a loan a long time before and says to him: "I want my money back," he obviously does not ask for the specific greenbacks he put into the hands of the lendee. He will take any greenbacks, yellowbacks, coins, bank checks, or even promissory notes which, in their total value, will be the exact sum he turned over to the defaulting debtor. Thus, the Commonwealth here, in its petition for escheat, was not calling upon Western Union to search out the original coins and currency deposited by the senders who have since vanished in the mysterious sea of Whereabouts Unknown. The Commonwealth asked for the fiscal equivalent of that money.

Western Union itself does not think of money in a specific sense. When a customer wishes to transmit a monetary sum by telegraph he fills out a Western Union form which includes such designations as "money transfers" and "message to be delivered with the money." No one assumes that by the phrase "money transfer", Western Union is expected to actually transport to the payee the coins and currency the customer places on the counter and for which he is handed a receipt.

The notice which is sent to the payee carries the sentence: "We have received a sum of money by telegraph for you." By the use of this language Western

Union does not intend to suggest that the legal tender it is ready to pay over to the payee is the exchange-stained currency and travel-battered coins which came from the pocket of the sender.

The interpretation argued for by Western Union contradicts what the courts have often declared on the subject. The Supreme Court of the United States said in *Connecticut Mutual Life Insurance Company v. Moore*, 333 U.S. 541: "The statutory reference to 'any moneys held or owing' does not refer to any specific assets of an insurance company, but simply to the obligation of the life insurance company to pay it."

In *Newhard v. Newhard*, 303 Pa. 299, 301, this Court said: "The word 'money' is a general term and may and often does include property other than currency."

The respondent also argues that the Commonwealth may not escheat "moneys" in its possession because it has issued drafts to payees and even to senders which are still outstanding, but the mere issuance of drafts does not constitute payment, since there is no agreement between the parties to that effect. *Levan v. Wilten*, 135 Pa. 61, 63; *Easton School District v. Continental Casualty Co.*, 304 Pa. 67, 71; *North Penn Iron Co. v. N. J. Bridge Co.*, 35 Pa. Superior Ct. 84, 85.

Thus, interpreting the Commonwealth's petition as seeking escheat of the unclaimed obligations held by Western Union rather than any specific moneys deposited by the senders and which Western Union no longer possesses, we inevitably come to the conclusion that the *res* of the escheat proceedings, is, contrary to the appellant's contention, within the control of the Commonwealth. It is within the control of the Commonwealth because the holder Western Union is subject to the jurisdiction of the courts of the Commonwealth. Personal service of the petition on offices of the Western Union within the confines of the Common-

wealth constituted a seizure of the *res,* which is the subject of the escheat.

On this subject, the Supreme Court of the United States, in *Standard Oil Co. v. New Jersey,* 341 U.S. 428, 439, said: "Since it is its obligation to pay to the escheated estate that is taken, personal service on appellant effects a seizure of that obligation. . . We see no reason to doubt that, where the debtor and creditor are within the jurisdiction of a court, that court has constitutional power to deal with the debt. Since choses in action have no spatial or tangible existence, control over them can 'only arise from control or power over the persons whose relationships are the source of the rights and obligations.' Estin v. Estin, 334 U.S. 541, 548. Situs of an intangible is fictional, but control over parties whose judicially coerced action can make effective rights created by the chose in action enables the court with such control to dispose of the rights of the parties to the intangible. . . The rights of the owners of the stock and dividends come within the reach of the court by the notice, i.e. service by publication; the rights of the appellant by personal service."

It was held in that case that the domiciliary State of the corporation, New Jersey, could escheat its stock certificates and undelivered dividends even though the addresses of some of the owners were in other states and foreign countries.

The Western Union Telegraph Company is not domiciled in Pennsylvania, but it is subject to its jurisdiction since it transacts business here in many offices, and personal service was obtained upon it in Pennsylvania. Moreover, all the transactions which are the bases of the respondent's outstanding obligations occurred in Pennsylvania by virtue of the fact that the senders deposited their money in Western Union offices located in Pennsylvania. As stated in

*Connecticut Mutual Life Ins. Co. v. Moore,* 297 N. Y. 1, 9: "The core of the debtor obligations of the plaintiff companies was created through acts done in this State, and the ties thereby established between the companies and the State were without more sufficient to validate the jurisdiction here asserted by the legislature." The Supreme Court of the United States, at 333 U.S. 541, affirmed this New York decision.

We find no error in the holding of the lower court that "When ownerless property held by a foreign corporation is within the dominion of this state, i.e., the res is subject to the State's control, Pennsylvania has the right to escheat the money, even as against the claims of the corporation's State of domicile, where the State has extensive contact with the transactions by which the res was created. . ."

Then Western Union contends that it would be unjust to require it to give up the unclaimed moneys in its possession because it might be besieged later on by senders, payees, or holders in due course of outstanding drafts. This picture conjures up a fear without objective basis. The instant escheat proceedings have to do with moneys which have been vainly seeking their missing owners for at least seven years. Thus, outstanding drafts would be stale-dated and therefore not honored. In any event, stop payments could be issued against them. But, most important of all, no belated claims for outstanding moneys could overcome the finality of escheat proceedings even without personal service on interested parties.

It must be emphasized that escheat proceedings are in rem and not in personam. "The proceeding is not one in personam—at least, not so far as concerns the depositor. The State does not seek to enforce any claim against him. It seeks to have the deposit transferred. The suit determines the custody (and perhaps the own-

ership) of the deposit. The state court likened the proceeding to garnishment, and thought that it should be described as quasi in rem. In form it resembles garnishment. In substance it is like proceedings in escheat, . . . for confiscation, . . .; for forfeiture, . . .; for condemnation, . . .; for registry of titles, . . .; and libels for possession brought by the Alien Property Custodian. . . . These are generally considered proceedings strictly in rem. But whether the proceeding should be described as being in rem or as being quasi in rem is not of legal significance in this connection. In either case the essentials of jurisdiction over the deposits are that there be seizure of the res at the commencement of the suit; and reasonable notice and opportunity to be heard. . . There is a seizure or its equivalent. . . Moreover, there is no constitutional objection to considering the proceeding as in personam, so far as concerns the bank; as quasi in rem, so far as concerns the depositors; and as strictly in rem, so far as concerns other claimants." (*Security Savings Bank v. California,* 263 U.S. 282.)

This decision puts into bold relief the irrefutable proposition that: "Seizure of the deposit is effected by personal service made upon the bank. . . Thereby the res is subjected to the jurisdiction of the court. . ."

Thus, the seizure of the *res* constituted constructive notice on all involved parties. In *Hollingsworth v. Barbour,* 29 U.S. 466, 475, the Supreme Court affirmed the lower court's statement that "The law regards the seizure of the thing as constructive notice to the whole world, and all persons concerned in interest are considered as affected by this constructive notice."

Moreover, in the instant case, there was a posting of the notice of the escheat proceedings in the office of the Prothonotary of Dauphin County and publication of the notice of the escheat proceedings in each of three newspapers of general circulation in the County of

Dauphin, the City of Philadelphia and the City of Pittsburgh. These notices were directed "To all persons whatsoever claiming an interest in the personal property herein referred to" and stated that the "names and last known addresses of the owners or beneficial owners of, or persons entitled to, the said property, the nature and amount of such property are set forth in the records on file in the office of the Prothonotary (of Dauphin Co.)". The notices described the property sought to be escheated as consisting of "amounts held and owing by The Western Union Telegraph Company, the defendant above named, arising from the receipt by it of various sums from divers persons for transmittal to other persons by the use of the defendant's money orders, and refundable to the senders because the defendant could not effect payment to the sendees, the whereabouts of the senders thereof, and of the owners or beneficial owners of or persons entitled to the said moneys, having been and remained unknown for seven successive years, and the said moneys having been unclaimed for the said period of seven successive years."

The Western Union submits that this notice cannot apply to cases where the sender or payee has received a draft which still remains unpaid, but, as already stated, the draft could not be regarded payment since there was no contract to that effect between the parties. Furthermore, the notice already quoted applies against third parties other than the sender, as witness the statement: "The whereabouts of the senders thereof, and of the owners or beneficial owners of or persons entitled to the said moneys."

Therefore, it is beyond refutation that all interested parties are on notice that publication of the indicated notice represents seizure of the *res* by personal service upon Western Union here in Pennsylvania. Nor does it matter that potentially interested parties are not

residents of Pennsylvania. It is the very fact that their whereabouts are unknown and have been unknown for over seven years that builds the foundation on which the escheat action rests. We made this clear in *Philadelphia Electric Company* case, 352 Pa. 457: "The Supreme Court of the United States has confirmed the jurisdiction of a State over intangibles and its power to subject them to escheat even as against possible nonresident owners".

Nor would Western Union need to fear that the moneys here involved would be subject to double escheat in New York, the State of its domicile. The decree of escheat here affirmed is naturally subject to the Full Faith and Credit Clause of the United States Constitution, as stated in *Standard Oil Co. v. New Jersey*, 341 U.S. 428: "The debts or demands represented by the stock and dividends having been taken from the appellant company by a valid judgment of New Jersey, the same debts or demands against appellant cannot be taken by another state. The Full Faith and Credit Clause bars any such double escheat."

Decree affirmed, each party to bear own costs.

Mr. Justice BELL took no part in the consideration or decision of this case.