## PENNSYLVANIA v. NEW YORK ET AL.

No. 40, Orig.   Argued March 29, 1972—Decided June 19, 1972

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and DOUGLAS, STEWART, WHITE, and MARSHALL, JJ., joined. POWELL, J., filed a dissenting opinion, in which BLACKMUN and REHNQUIST, JJ., joined, *post*, p. 216.

*Herman Rosenberger II,* Assistant Attorney General of Pennsylvania, argued on the exceptions to the Report of the Special Master for plaintiff.   On the brief were *J. Shane Creamer,* Attorney General, and *Joseph H. Resnick,* Assistant Atorney General.

 *F. Michael Ahern,* Assistant Attorney General, argued on the exceptions to the Report of the Special Master for intervenor-plaintiff the State of Connecticut.   With him on the brief was *Robert K. Killian,* Attorney General.   *Theodore L. Sendak,* Attorney General, and *Rob-*

ert A. Zaban, Deputy Attorney General, filed a brief on exceptions to the Report of the Special Master for intervenor-plaintiff the State of Indiana.

Winifred L. Wentworth, Assistant Attorney General, argued on the exceptions to the Report of the Special Master for defendant the State of Florida. With her on the brief was Robert L. Shevin, Attorney General. Julius Greenfield, Assistant Attorney General, argued in support of the Report of the Special Master for defendant the State of New York. With him on the brief were Louis J. Lefkowitz, Attorney General, Samuel A. Hirshowitz, First Assistant Attorney General, and Gustave Harrow, Assistant Attorney General. Lee Johnson, Attorney General, John W. Osburn, Solicitor General, and Philip J. Engelgau, Assistant Attorney General, filed a brief on exceptions to the Report of the Special Master for defendant the State of Oregon.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Pennsylvania and other States except to, and New York supports,[1] the Report of the Special Master filed in this original action brought by Pennsylvania against New York for a determination respecting the authority of the several States to escheat, or take custody of, unclaimed funds paid to the Western Union Telegraph Company for the purchase of money orders.[2] We over-

[1] Of the remaining States party to this case, Florida has filed exceptions as defendant, and Connecticut and Indiana as intervening plaintiffs. New Jersey has filed a brief amicus curiae in support of Pennsylvania's position.

[2] We granted leave to file the bill of complaint, 398 U. S. 956, permitted the State of Connecticut to intervene as a party plaintiff, and appointed Mr. John F. Davis as a Special Master to take evidence and make appropriate reports. 400 U. S. 811. Thereafter, California and Indiana were permitted to intervene as plaintiffs, and Arizona as a defendant. 400 U. S. 924, 1019; 401 U. S. 931.

rule the exceptions and enter the decree recommended by the Special Master, see *post,* p. 223.[3]

The nature of Western Union's money order business, and the source of the funds here in dispute, were described by the Court in *Western Union Telegraph Co.* v. *Pennsylvania,* 368 U. S. 71 (1961):

> "Western Union is a corporation chartered under New York law with its principal place of business in that State. It also does business and has offices in all the other States except Alaska and Hawaii, [as well as] in the District of Columbia, and in foreign countries, and was from 1916 to 1934 subject to regulation by the I. C. C. and since then by the F. C. C. In addition to sending telegraphic messages throughout its world-wide system, it carries on a telegraphic money order business which commonly works like this. A sender goes to a Western Union office, fills out an application and gives it to the company clerk who waits on him together with the money to be sent and the charges for sending it. A receipt is given the sender and a telegraph message is transmitted to the company's office nearest to the payee directing that office to pay the money order to the payee. The payee is then notified and upon properly identifying himself is given a negotiable draft, which he can either endorse and cash at once or keep for use in the future. If the payee cannot be located for delivery of the notice, or fails to call for the draft within 72 hours, the office of destination notifies the sending office. This office then notifies the original sender of the failure to deliver and makes a refund, as it

---

[3] The exception of Indiana as to a typographical error in the recommended decree is sustained. The phrase "escheat of custodial taking" in paragraph 2, lines 4–5 of the decree should read "escheat or custodial taking."

makes payments to payees, by way of a negotiable draft which may be either cashed immediately or kept for use in the future.

"In the thousands of money order transactions carried on by the company, it sometimes happens that it can neither make payment to the payee nor make a refund to the sender. Similarly payees and senders who accept drafts as payment or refund sometimes fail to cash them. For this reason large sums of money due from Western Union for undelivered money orders and unpaid drafts accumulate over the years in the company's offices and bank accounts throughout the country." *Id.*, at 72–73.

In 1953 Pennsylvania began state proceedings under its escheat statute [4] to take custody of those unclaimed funds, held by Western Union, that arose from money order purchases in the company's Pennsylvania offices. The Supreme Court of Pennsylvania affirmed a judgment for the State of about $40,000, *Commonwealth* v. *Western Union,* 400 Pa. 337, 162 A. 2d 617 (1960), but this Court reversed, *Western Union Telegraph Co.* v. *Pennsylvania, supra,* holding that the state court judgment denied Western Union due process of law because it could not protect the company against rival claims of other States. We noted that controversies among different

---

[4] The Pennsylvania statute, Act of July 29, 1953, P. L. 986, § 1, (Pa. Stat. Ann., Tit. 27, § 333) provides in part:

"(b) Whensoever the . . . person entitled to any . . . personal property within or subject to the control of the Commonwealth or the whereabouts of such . . . person entitled has been or shall be and remain unknown for the period of seven successive years, such . . . personal property . . . shall escheat to the Commonwealth . . . .

"(c) Whensoever any . . . personal property within or subject to the control of this Commonwealth has been or shall be and remain unclaimed for the period of seven successive years, such . . . personal property . . . shall escheat to the Commonwealth . . . ."

States over their right to escheat intangibles could be settled only in a forum "where all the States that want to do so can present their claims for consideration and final, authoritative determination. Our Court has jurisdiction to do that." *Id.*, at 79.

Thereafter, in *Texas* v. *New Jersey,* 379 U. S. 674 (1965), the Court was asked to decide which of several States was entitled to escheat intangible property consisting of debts owed by the Sun Oil Co. and left unclaimed by creditors. Four different rules were proposed. Texas argued that the funds should go to the State having the most significant "contacts" with the debt, as measured by a number of factors; New Jersey, that they should go to the State of the debtor company's incorporation; Pennsylvania, to the State where the company had its principal place of business; and Florida, to the State of the creditor's last known address as shown by the debtor's books and records. We rejected Texas' and Pennsylvania's proposals as being too uncertain and difficult to administer, and rejected New Jersey's because "it would too greatly exalt a minor factor to permit escheat of obligations incurred all over the country by the State in which the debtor happened to incorporate itself." *Id.*, at 680. Florida's proposal, on the other hand, was regarded not only as a "simple and easy" standard to follow, but also as one that tended "to distribute escheats among the States in the proportion of the commercial activities of their residents." *Id.*, at 681. We therefore held that the State of the creditor's last known address is entitled to escheat the property owed him, adding that if his address does not appear on the debtor's books or is in a State that does not provide for escheat of intangibles, then the State of the debtor's incorporation may take custody of the funds "until some other

State comes forward with proof that it has a superior right to escheat." *Id.,* at 682. The opinion concluded:

> "We realize that this case could have been resolved otherwise, for the issue here is not controlled by statutory or constitutional provisions or by past decisions, nor is it entirely one of logic. It is fundamentally a question of ease of administration and of equity. We believe that the rule we adopt is the fairest, is easy to apply, and in the long run will be the most generally acceptable to all the States." *Id.,* at 683.

On March 13, 1970, Pennsylvania filed this original action to renew its efforts to escheat part of Western Union's unclaimed money order proceeds. The complaint alleged that Western Union had accumulated more than $1,500,000 in unclaimed funds "on account of money orders purchased from the company on or before December 31, 1962," and that about $100,000 of that amount, "held by Western Union on account of money orders purchased from it in Pennsylvania," was subject to escheat by that State. Pennsylvania, asked for a judgment resolving the conflicting claims of it and the defendant States, and for a temporary injunction against payment of the funds by Western Union or a taking of them by the defendant States, pending disposition of the case.[5]

In their arguments before the Special Master, the parties suggested three different formulas to resolve their conflicting claims. Pennsylvania contended that Western Union's money order records do not identify anyone as a "creditor" of the company and in many instances do

---

[5] The Court has taken no action on the plea for temporary injunction, and accepts the recommendation of the Special Master that it now "be denied as 'unnecessary." Report 3 n. 2.

not list an address for either the sender or payee; therefore, strict application of the *Texas* v. *New Jersey* rule to this type of intangible would result in the escheat of almost all the funds to the State of incorporation, here New York. To avoid this result, Pennsylvania proposed that the State where the money order was purchased be permitted to take the funds. It claimed that the State where the money orders are bought should be presumed to be the State of the sender's residence. Connecticut, California, and Indiana supported this proposal, as did New Jersey as *amicus curiae*.

Florida and Arizona also supported Pennsylvania, but argued that where the payee had received but not cashed the money order, his address, if known, should determine escheat, regardless of the sender's address.

New York argued that *Texas* v. *New Jersey* should be strictly applied, but that it was not retroactive. Thus, as to money orders purchased between 1930 and 1958 (seven years before the *Texas* decision)[6] New York asserted its right as the State of incorporation to all unclaimed funds, regardless of the creditor's address.[7] As for money orders drawn after 1958, New York would apply the *Texas* rule, and take the funds in all cases where the creditor's address did not appear or was located in a State not providing for escheat.

The Special Master has submitted a report recommending that the *Texas* rule "be applied to all the items involved in this case regardless of the date of the trans-

---

[6] New York makes no claim with respect to money orders issued before 1930.

[7] Section 1309 of New York's Abandoned Property Law provides for the custodial taking, not escheat, of uncashed money orders, so that "the rights of a holder of a . . . money order to payment . . . shall be in no wise affected, impaired or enlarged by reason of the provisions of this section or by reason of the payment to the state comptroller of abandoned property hereunder."

actions out of which they arose." Report 21. The Report expresses some doubt about the constitutionality of the suggested alternatives, stating that both the place-of-purchase and place-of-destination rules might permit intangible property rights to be "cut off or adversely affected by state action in an *in rem* proceeding in a forum having no continuing relationship to any of the parties to the proceedings." *Id.*, at 19. These doubts, however, were not the sole basis for the Special Master's recommendation. He found that "[a]s in the case of the obligations in [*Texas* v. *New Jersey*], [the *Texas*] rule presents an easily administered standard preventing multiple claims and giving all parties a fixed rule on which they can rely." *Id.*, at 20. He concluded that:

> "Any sum now held by Western Union unclaimed for the period of time prescribed by the applicable State statutes may be escheated or taken into custody by the State in which the records of Western Union placed the address of the creditor, whether that creditor be the payee of an unpaid draft, the sender of a money order entitled to a refund, or an individual whose claim has been underpaid through error. . . . [I]f no address is contained in the records of Western Union, or if the State in which the address of the creditor falls has no applicable escheat law, then the right to escheat or take custody shall be in the domiciliary State of the debtor, in this case, New York." *Id.*, at 20–21.

The Report also states that New York would bear the burden of establishing "as to all escheatable items the absence from Western Union's records of an address for the creditor." *Id.*, at 16.

Pennsylvania's exceptions argue that where a transaction is of a type that "the obligor does not make entries upon its books and records showing the address of the

obligee," only "the State of origin of the transaction" should be permitted to escheat. Florida and Arizona have abandoned their state-of-destination test, and together with the other participating States save New York, have joined in Pennsylvania's exceptions. Tr. of Oral Arg. 20, 42.

Pennsylvania's proposal has some surface appeal. Because Western Union does not regularly record the addresses of its money order creditors, it is likely that the corporate domicile will receive a much larger share of the unclaimed funds here than in the case of other obligations, like bills for services rendered, where such records are kept as a matter of business practice. In a sense, there is some inconsistency between that result and our refusal in *Texas* to make the debtor's domicile the primary recipient of unclaimed intangibles. Furthermore, the parties say, the *Texas* rule is nothing more than a legal presumption that the creditor's residence is in the State of his last known address. A presumption based on the place of purchase is equally valid, they argue, and should be applied in order to prevent New York from gaining this windfall.

Assuming, without resolving the doubts expressed by the Special Master, that the Pennsylvania rule provides a constitutional basis for escheat, we do not regard the likelihood of a "windfall" for New York as a sufficient reason for carving out this exception to the *Texas* rule. *Texas* v. *New Jersey* was not grounded on the assumption that all creditors' addresses are known. Indeed, as to four of the eight classes of debt involved in that case, the Court expressly found that some of the creditors "had no last address indicated." 379 U. S., at 675–676, n. 4. Thus, the only arguable basis for distinguishing money orders is that they involve a higher percentage of unknown addresses. But we are not told what percentage

is high enough to justify an exception to the *Texas* rule, nor is it entirely clear that money orders constitute the only form of transaction where the percentage of unknown addresses may run high. In other words, to vary the application of the *Texas* rule according to the adequacy of the debtor's records would require this Court to do precisely what we said should be avoided—that is, "to decide each escheat case on the basis of its particular facts or to devise new rules of law to apply to ever-developing new categories of facts." *Texas* v. *New Jersey,* 379 U. S., at 679.

Furthermore, a substantial number of creditors' addresses may in fact be available in this case. Although Western Union has not kept ledger records of addresses, the parties stipulated, and the Special Master found, that money order applications have been retained in the company's records "as far back as 1930 in some instances and are generally available since 1941." Report 9. To the extent that creditor addresses are avaiiable from those forms, the "windfall" to New York will, of course, be diminished.

We think that as a matter of fairness the claimant States, and not Western Union, should bear the cost of finding and recording the available addresses, and we shall remand to the Special Master for a hearing and recommendation as to the appropriate formula for distributing those costs. As for future money order transactions, nothing we say here prohibits the States from requiring Western Union to keep adequate address records. The decree recommended by the Special Master is adopted and entered,[8] and the cause is remanded to the

[8] Insofar as the invocation of any provision of the Revised Uniform Disposition of Unclaimed Property Act would be inconsistent with this decree, the decree prevails. See *Board of Education* v. *Swann,* 402 U. S. 43, 45–46 (1971).

Special Master for further proceedings and the filing of a proposed supplemental decree with respect to the distribution of costs of the inquiry as to available addresses.

*It is so ordered.*

[For decree adopted and entered by the Court, see *post*, p. 223.]

MR. JUSTICE POWELL, with whom MR. JUSTICE BLACKMUN and MR. JUSTICE REHNQUIST join, dissenting.

The majority opinion today purports to apply the rule laid down in *Texas* v. *New Jersey*, 379 U. S. 674 (1965), to a fact situation not contemplated when that case was decided. In applying that rule to these new facts, it seems to me that the Court exalts the rule but derogates the reasons supporting it.

I

*Texas* v. *New Jersey*, a case decided within the Court's original jurisdiction, is a unique precedent. Disposition of that case necessarily required a departure from the Court's usual mode of decisionmaking. Our role in this country's scheme of government is ordinarily a restricted one, limited in large measure to the resolution of conflicts calling for the interpretation and application either of statutory acts or of provisions of the Federal Constitution. In the performance of this function, an individual Justice's views as to what he might consider "fair" or "equitable" or "expeditious" are largely immaterial. Infrequently, however, we are called on to resolve disputes arising under the original jurisdiction of the Court (Art. III, § 2) in which our judgment is unaided by statutory or constitutional directives.

In approaching such cases, we may find, as did the

Court in *Texas* v. *New Jersey,* that fairness and expeditiousness provide the guideposts for our decision:

> "[T]he issue here is not controlled by statutory or constitutional provisions or by past decisions, nor is it entirely one of logic. It is fundamentally a question of ease of administration and of equity." *Id.,* at 683.

The case before us today requires the application of similar principles, and I agree that Mr. Justice Black's opinion in *Texas* v. *New Jersey* points the way to the most desirable result. In my view, however, the majority's application of that precedent to the facts of this case offends both the "fairness" and "ease of administration" bases of that opinion.

The Court in *Texas* v. *New Jersey* was asked to decide which States could take title to escheatable intangible personal property in the form of debts owed by Sun Oil Co. to a large number of individual creditors. After rejecting several alternatives offered by the parties, the Court adopted the rule proposed by the State of Florida and approved by the Special Master. Under that rule the power to escheat the debts in question, in the first instance, was to be accorded "to the State of the creditor's last known address as shown by the debtor's books and records." *Id.,* at 680–681. In the "infrequent" case in which no record of last address was available or in which the appropriate State's laws did not provide for the escheat of abandoned intangibles, the property was to go to the State of the debtor's corporate domicile. *Id.,* at 682.

This disposition recommended itself to the Court for several reasons. The rule was generally consistent with the common-law maxim *"mobilia sequuntur personam"**

---

*See *Blodgett* v. *Silberman,* 277 U. S. 1, 9–10 (1928).

under which intangible personal property may be found to follow the domicile of its owner—here the creditor. *Id.*, at 680 n. 10. In looking to the residence of the creditor, the rule adopted by the Court recognized that the Company's unclaimed debts were assets of the individual creditors rather than assets of the debtor. *Id.*, at 681. Also, in distributing the property among the creditors' States, the rule had the advantage of dividing the property in a manner roughly proportionate to the commercial activities of each State's residents. In using the last-known address as the sole indicator of domicile, the rule would be easy to administer and apply. The Court recognized, of course, that this approach might lead to the escheat of property to a State from which the creditor had removed himself in the period since the debt arose. Yet it concluded that these instances would "tend to a large extent to cancel each other out," and would not disrupt the basic fairness and expeditiousness of the result. *Id.*, at 681.

Paradoxically, the mechanistic application of the *Texas v. New Jersey* rule to the present case leads ultimately to the defeat of each of the beneficial justifications for that rule. Unlike the records of the numerous debts owed by Sun Oil, Western Union's records may reflect the creditors' addresses for only a relatively small percentage of the transactions. As a consequence, the greater portion of the entire Western Union fund will go to the State of New York—the State of corporate domicile. Effectively then, the obligation of the debtor will be converted into an asset of the debtor's State of domicile to the exclusion of the creditors' States. The Court in *Texas v. New Jersey* specifically repudiated this result on the ground that it was inconsistent with "principles of fairness." *Id.*, at 680. It would have "exalt[ed] a minor factor to permit escheat of obligations incurred all over the country by the State in which the debtor happened

to incorporate itself." *Ibid.* The fact that the Court was willing to permit this result in the few cases in which no record of address was available or in which no law of escheat governed, does not diminish the clear view of the Court that this result would be impermissible as a basis for disposing of more than a small minority of the debts. Yet the decision today ignores the Court's unwillingness to "exalt" the largely coincidental domicile of the corporate debtor. It also disregards the Court's clearly expressed intent that the escheatable property be distributed in proportions roughly comparable to the volume of transactions conducted in each State.

Furthermore, the rule today is incompatible with the Court's view in *Texas* v. *New Jersey* that an easily and inexpensively discernible mode of allocation be utilized. The majority's rule will require the examination of every available money order application to determine whether the applicant filled out the address blank for his own address, or in the case of money order drafts received but not cashed, whether the holder's address had been preserved. Western Union estimated in the stipulated statement of facts that such an item-by-item examination could be undertaken at a cost of approximately $175,000. Report of the Special Master 16.

In sum, the invocation of the *Texas* v. *New Jersey* rule in the manner contemplated by the majority will lead to a result that is neither expeditious nor equitable.

## II

The reasons underlying *Texas* v. *New Jersey* could best be effectuated by a relatively minor but logical deviation in the manner in which that rule is implemented in this case. Rather than embarking upon a potentially fruitless search for the creditor's last-known address as a rough indicator of domicile, reliance should be placed upon the State where the debtor-creditor relationship was

established. In most cases that State is likely also to be the site of the creditor's domicile. In other words, in the case of money orders sent and then returned to the initiating Western Union office because the sendee failed to claim the money, the State in which the money order was purchased may be presumed to be the State of the purchaser-creditor's domicile. And, where the draft has been received by either the initiating party or by the recipient but not negotiated, the State in which the draft was issued may be assumed to be the State of that creditor's domicile.

This modification is preferable, first, because it preserves the equitable foundation of the *Texas v. New Jersey* rule. The State of the corporate debtor's domicile is denied a "windfall"; the fund is divided in a proportion approximating the volume of transactions occurring in each State; and the integrity of the notion that these amounts represent assets of the individual purchasers or recipients of money orders is maintained. Secondly, the relevant information would be more easily obtainable. The place of purchase and the office of destination are reflected in Western Union's ledger books and it would, therefore, be unnecessary to examine the innumerable application forms themselves. Since the ledgers are more readily available, the allocation of the fund would be effected at less expense than would be required by the majority's resolution.

Despite these advantages, the Special Master rejected this alternative. He reasoned that an undetermined number of these transactions must have taken place outside the creditors' State of domicile. Specifically, he cited the cases in which a New Jersey or Connecticut resident might purchase a money order in New York, or cases in which a resident of Virginia or Maryland might make his purchase in the District of Columbia. Report of the Special Master 18. While such cases

certainly exist, they are merely exceptions to a generally reliable rule that money order purchases are likely to have occurred within the State of the purchaser's domicile. That perfection is not achieved is no reason to reject this alternative. The *Texas* v. *New Jersey* Court recognized that absolute fairness was not obtainable and that the most that could be expected was a rule providing a reasonable approximation. *Id.,* at 681 n. 11. Certainly this objection should not be allowed to frustrate the better alternative in favor of one that is less fair and more difficult to administer.

## III

The majority opinion intimates, as I think it must, that the ultimate consequence of its decision today is inconsistent (*ante,* at 214) with the result in *Texas* v. *New Jersey*. While the opinion appears to recognize that New York will reap the very "windfall" that *Texas* v. *New Jersey* sought to avoid, its refusal to bend in the face of this consequence goes largely unexplained. Apparently, the basis for its decision is the conviction that the Court's prior precedent was designed to settle the question of escheat of intangible personal property "once and for all." *Id.,* at 678. The majority adheres to the existing rule because of some apprehension that flexibility in this case will deprive the Court of a satisfactory test for the resolution of future cases. The opinion anticipates that departure from *Texas* v. *New Jersey* will leave other cases to be decided on an *ad hoc* basis, depending in each case on the "adequacy of the debtor's records." *Ante,* at 215. Although the factual circumstances of future cases cannot be predicted, it is likely that most of such cases can be resolved within the principles of *Texas* v. *New Jersey*. The factual range is limited. The debtor either will or will not maintain creditors' addresses in the ordinary course of business.

In some categories of transactions, such as those involving money orders and traveler's checks, adequate address records may not be available. In the case of ordinary corporate debts, however, it is more likely that records will be available. Moreover, as the majority points out, any State is free to require corporations doing business in that State to maintain records of their creditors' addresses. *Ante,* at 215.

In short, the threat of frequent and complicated cases in this area seems remote. It provides little justification for the majority's Cinderella-like compulsion to accommodate this ill-fitting precedential "slipper." From a result that seems both inflexible and inequitable, I dissent.