# DELAWARE *v.* NEW YORK

No. 111, Orig.   Argued December 9, 1992—Decided March 30, 1993

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined. WHITE, J., filed a dissenting opinion, in which BLACKMUN and STEVENS, JJ., joined, *post*, p. 510.

*Dennis G. Lyons* argued the cause for plaintiff. With him on the briefs were *Charles M. Oberly III*, Attorney General of Delaware, *J. Patrick Hurley, Jr.*, Deputy Attorney General, and *Kent A. Yalowitz.*

*Jerry Boone*, Solicitor General of New York, argued the cause for defendant. With him on the briefs were *Robert Abrams*, Attorney General, and *Robert A. Forte*, Assistant Attorney General.

*Bernard Nash* argued the cause for intervenors State of Alabama et al. With him on the briefs were *Andrew P. Miller, William Bradford Reynolds, Judith E. Schaeffer, Dan Schweitzer, Daniel E. Lungren*, Attorney General of California, *Roderick E. Walston*, Chief Assistant Attorney General, *Thomas F. Gede*, Special Assistant Attorney General, and *Yeoryios C. Apallas*, Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Jimmy Evans* of Alabama, *Charles Cole* of Alaska, *Winston Bryant* of Arkansas, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia, *Warren Price III* of Hawaii, *Roland W. Burris* of Illinois, *Linley E. Pearson* of Indiana, *Bonnie Campbell* of Iowa, *Robert T. Stephan* of Kansas, *Chris Gorman* of Kentucky, *Richard Ieyoub* of Loui-

siana, *Michael E. Carpenter* of Maine, *Mike Moore* of Mississippi, *William L. Webster* of Missouri, *Marc Racicot* of Montana, *Frankie Sue Del Papa* of Nevada, *John P. Arnold* of New Hampshire, *Robert J. Del Tufo* of New Jersey, *Nicholas J. Spaeth* of North Dakota, *Lee Fisher* of Ohio, *Susan B. Loving* of Oklahoma, *Ernest D. Preate, Jr.,* of Pennsylvania, *James E. O'Neil* of Rhode Island, *Mark Barnett* of South Dakota, *R. Paul Van Dam* of Utah, *Jeffrey L. Amestoy* of Vermont, *Kenneth O. Eikenberry* of Washington, *Mario J. Palumbo* of West Virginia, and *Joseph B. Meyer* of Wyoming.

*James F. Flug, Martin Lobel, Frank J. Kelley,* Attorney General of Michigan, *J. Joseph Curran, Jr.,* Attorney General of Maryland, *John Payton,* Corporation Counsel of District of Columbia, *Charles L. Reischel,* Deputy Corporation Counsel, and *Lutz Alexander Prager,* Assistant Deputy Corporation Counsel, *Don Stenberg,* Attorney General of Nebraska, and *Dale A. Comer,* Assistant Attorney General, filed briefs for intervenors State of Michigan et al.

A brief for intervenors State of Texas et al. was filed by *Dan Morales,* Attorney General of Texas, *Will Pryor,* First Assistant Attorney General, *Mary R. Keller,* Deputy Attorney General, and *James A. Thomassen* and *Jeffrey A. Coryell,* Assistant Attorneys General, *Grant Woods,* Attorney General of Arizona, and *Gail H. Boyd,* Assistant Attorney General, *Gale A. Norton,* Attorney General of Colorado, *Raymond T. Slaughter,* Chief Deputy Attorney General, *Timothy M. Tymkovich,* Solicitor General, and *Maurice Knaizer,* Assistant Attorney General, *Richard Blumenthal,* Attorney General of Connecticut, and *William J. Prensky,* Assistant Attorney General, *Larry EchoHawk,* Attorney General of Idaho, and *Theodore V. Spangler, Jr.,* and *Lawrence G. Sirhall, Jr.,* Deputy Attorneys General, *Hubert H. Humphrey III,* Attorney General of Minnesota, and *Alan Gilbert,* Assistant Attorney General, *Tom Udall,* Attorney General of New Mexico, and *Guru Terath Singh Khalsa,*

Assistant Attorney General, *Lacy H. Thornburg,* Attorney General of North Carolina, *Andrew A. Vanore, Jr.,* Chief Deputy Attorney General, *M. Ann Reed,* Senior Deputy Attorney General, and *Douglas A. Johnston,* Assistant Attorney General, *Charles S. Crookham,* Attorney General of Oregon, *Jack L. Landau,* Deputy Attorney General, *Virginia L. Linder,* Solicitor General, and *William R. Cook,* Assistant Attorney General, *T. Travis Medlock,* Attorney General of South Carolina, *Ray N. Stevens,* Chief Deputy Attorney General, and *Ronald W. Urban,* Deputy Attorney General, *Charles W. Burson,* Attorney General of Tennessee, and *Michael W. Catalano,* Deputy Attorney General, *James E. Doyle,* Attorney General of Wisconsin, and *Burneatta Bridge,* Assistant Attorney General, *Mary Sue Terry,* Attorney General of Virginia, *Stephen D. Rosenthal,* Chief Deputy Attorney General, *Gail Starling Marshall* and *Mary Yancey Spencer,* Deputy Attorneys General, and *E. Suzanne Darling,* Assistant Attorney General.*

JUSTICE THOMAS delivered the opinion of the Court.

In this original action, we resolve another dispute among States that assert competing claims to abandoned intangible personal property. Most of the funds at issue are unclaimed securities distributions held by intermediary banks, brokers, and depositories for beneficial owners who cannot be identified or located. The Special Master proposed awarding the right to escheat such funds to the State in which the principal executive offices of the securities issuer are located. Adhering to the rules announced in *Texas* v. *New Jersey,* 379 U. S. 674 (1965), and *Pennsylvania* v. *New York,* 407 U. S. 206 (1972), we hold that the State in which the intermediary is incorporated has the right to escheat funds belonging to beneficial owners who cannot be identified or located.

---

*Briefs of *amici curiae* were filed for Midwest Securities Trust Co. et al. by *Michael Fischer* and *Ilene Knable Gotts;* and for the Securities Industry Association et al. by *Judith Welcom.*

## I

This case involves unclaimed dividends, interest, and other distributions made by issuers of securities. Such payments are often channeled through financial intermediaries such as banks, brokers, and depositories before they reach their beneficial owners. By arrangement with the beneficial owners, these intermediaries frequently hold securities in their own names rather than in the names of the beneficial owners; as "record owners," the intermediaries are fully entitled to receive distributions based on those securities.[1] This practice of holding securities in "nominee name" or "street name" facilitates the offering of customized financial services such as cash management accounts,[2] brokerage margin accounts,[3] discretionary trusts,[4] and dividend reinvestment programs.[5] Street name accounts also permit changes in beneficial ownership to be effected through book entries rather than the unwieldy physical transfer of securities certificates. See Brown, The Shareholder Communication Rules and the Securities and Exchange Commission: An Exercise in Regulatory

---

[1] An individual investor who opts to retain record ownership of a security will receive distributions directly from the issuer. This case does not concern transactions of this sort.

[2] In a cash management account, the broker holds, rather than distributes, dividends and interest paid on a customer's securities. The customer withdraws funds through a check-like negotiable instrument and receives interest on held funds, typically at a rate higher than that offered on passbook savings accounts and negotiable-order-of-withdrawal accounts.

[3] In a brokerage margin account, the broker holds the customer's securities as collateral against any margin debt generated by the customer's stock market transactions. Dividends and other distributions may be credited against a customer's margin debt to the broker.

[4] In a discretionary trust, the financial institution as trustee enjoys the discretion not to distribute current income but rather to accumulate it for further investment.

[5] In a dividend reinvestment program, the beneficial owner authorizes the broker to use dividends to purchase additional shares and fractional shares.

Utility or Futility?, 13 J. Corp. L. 683, 688–691 (1988). The economies of scale attained in the modern financial services industry are epitomized by the securities depository, a large institution that holds only the accounts of "participant" brokers and banks and serves as a clearinghouse for its participants' securities transactions. Because a depository retains record ownership of securities, it effectively "immobilizes" the certificates in its possession by allowing its participants to trade securities without the physical transfer of certificates. Most of the equity securities traded on the New York Stock Exchange are immobilized in this fashion. See App. to Report of the Special Master B–2. Cf. Securities and Exchange Commission, Division of Market Regulation, Progress and Prospects: Depository Immobilization of Securities and Use of Book-Entry Systems 4 (1985).

The intermediaries are unable to distribute a small portion of the securities to their beneficial owners.[6] When an intermediary claims no property interest in funds so held, they become escheatable.[7] Between 1985 and 1989, New York escheated $360 million in funds of abandoned securities held for more than three years by intermediaries doing business in New York, without regard to the last known address of the beneficial owner or the intermediary's State of incorporation. N. Y. Aband. Prop. Law § 511 (McKinney 1991). See Report of Special Master 10, n. 9. Alleging that certain of these securities were wrongfully escheated, Delaware sought leave in 1988 to initiate an original action in this Court against

---

[6] Approximately 0.02% of funds distributed through intermediaries cannot be traced to their beneficial owners. This low percentage nevertheless accounts for a very substantial amount of escheatable property. See Report of Special Master 10, n. 9.

[7] Unlike Depository Trust Company, the two other securities depositories in the United States "do claim entitlement to certain securities, interest payments, dividends and distributions that cannot be accounted for." Brief for Midwest Securities Trust Co. et al. as *Amici Curiae* 2. The issue of these depositories' "entitlement to the excess funds under their rules" is not before us. *Id.*, at 3.

New York. We granted leave to file the complaint, 486 U. S. 1030 (1988), and appointed a Special Master, 488 U. S. 990 (1988). We granted Texas' motion to file a complaint as an intervening plaintiff, 489 U. S. 1005 (1989), and every State not already a party to this proceeding and the District of Columbia sought leave to intervene.

On January 28, 1992, the Master filed his report and recommendation. Both Delaware and New York have lodged exceptions to the report, as have four other parties whose motions for leave to intervene have not been granted by this Court.[8] We now sustain two of Delaware's exceptions in their entirety, one of Delaware's exceptions in part, and one of New York's exceptions. We also grant all pending motions to intervene and to file briefs as *amici curiae*, overrule all exceptions not sustained in this opinion, and remand for further proceedings before the Master.

## II

States as sovereigns may take custody of or assume title to abandoned personal property as *bona vacantia*, a process commonly (though somewhat erroneously) called escheat.[9] See, *e. g.*, *Christianson* v. *King County*, 239 U. S. 356, 365–366 (1915); *Cunnius* v. *Reading School Dist.*, 198 U. S. 458, 469–476 (1905); *Hamilton* v. *Brown*, 161 U. S. 256, 263–264 (1896). No serious controversy can arise between States seeking to escheat "tangible property, real or personal," for "it has always been the unquestioned rule in all jurisdictions that only the State in which the property is located may es-

---

[8] In a joint brief, Michigan, Maryland, Nebraska, and the District of Columbia filed two exceptions to the Master's report.

[9] "At common law, abandoned personal property was not the subject of escheat, but was subject only to the right of appropriation by the sovereign as *bona vacantia*." *Anderson Nat. Bank* v. *Luckett*, 321 U. S. 233, 240 (1944). See generally 7 W. Holdsworth, A History of English Law 495–496 (2d ed. 1937). Our opinions, however, have understood "escheat" as encompassing the appropriation of both real and personal property, and we use the term in that broad sense.

cheat." *Texas* v. *New Jersey*, 379 U. S., at 677. On the other hand, intangible property "is not physical matter which can be located on a map," *ibid.*, and frequently no single State can claim an uncontested right to escheat such property.

In *Texas* v. *New Jersey*, we discharged "our responsibility in the exercise of our original jurisdiction" to resolve escheat disputes that "the States separately are without constitutional power . . . to settle." *Ibid.*[10] We adopted two rules intended to "settle the question of which State will be allowed to escheat [abandoned] intangible property." *Ibid.* "[S]ince a debt is property of the creditor, not of the debtor," we reasoned, "fairness among the States requires that the right and power to escheat the debt should be accorded to the State of the creditor's last known address as shown by the debtor's books and records." *Id.*, at 680–681 (footnote omitted). This primary rule had the virtue of "involv[ing] a factual issue simple and easy to resolve," made even simpler by the Court's resort to "last known address, rather than technical legal concepts of residence and domicile." *Id.*, at 681. It also achieved rough equity in that it "tend[ed] to distribute escheats among the States in the proportion of the commercial activities of their residents." *Ibid.* We recognized, however, that the primary rule could not resolve escheat claims over "property owed persons (1) as to whom there is no record of any address at all, or (2) whose last known address is in a State which does not provide for escheat of the property owed them." *Id.*, at 682. For these situations, we adopted a secondary rule awarding the right to escheat to the debtor's "State of corporate domicile," subject to the claims of the State with "a superior right to escheat" under the primary rule. *Ibid.* We characterized the *Texas* scheme as "the fairest, . . . easy to apply, and in the

---

[10] See also *Western Union Telegraph Co.* v. *Pennsylvania*, 368 U. S. 71, 75 (1961); *Standard Oil Co.* v. *New Jersey*, 341 U. S. 428, 443 (1951).

long run . . . the most generally acceptable to all the States." *Id.*, at 683.

We reaffirmed *Texas* in *Pennsylvania* v. *New York,* 407 U. S. 206 (1972). *Texas* had involved the relatively simple case of a debtor that "disclaimed any interest" in "various small debts . . . owed to . . . small creditors who ha[d] never appeared to collect them." *Texas, supra,* at 676, 675. In *Pennsylvania,* by contrast, the Western Union Company held proceeds left unclaimed because Western Union was unable to locate the payee of a money order or to make a refund to the sender or because drafts issued by Western Union were not negotiated. See 407 U. S., at 208–209; *Western Union Telegraph Co.* v. *Pennsylvania,* 368 U. S. 71, 72–73 (1961). Because Western Union did not "regularly record the addresses of its money order creditors," the primary rule would rarely apply, and the debtor's State of incorporation— Western Union's "corporate domicile"—would "receive a much larger share of the unclaimed funds" under the secondary rule. *Pennsylvania,* 407 U. S., at 214. In response to this perceived injustice, other States advocated a rule allowing the State of "the place of purchase" to escheat under the primary rule. We nevertheless adhered to our decision in *Texas.* The "only arguable" difference between money orders and the obligations at issue in *Texas* lay in the fact that money orders "involve a higher percentage of unknown addresses." 407 U. S., at 214. We reasoned that neither this distinction nor the resulting "likelihood of a 'windfall'" for the debtor's State of incorporation would justify the "carving out [of an] exception to the *Texas* rule." *Ibid.*

We therefore resolve disputes among States over the right to escheat intangible personal property in the following three steps. First, we must determine the precise debtor-creditor relationship as defined by the law that creates the property at issue. Second, because the property interest in any debt belongs to the creditor rather than the debtor, the primary rule gives the first opportunity to escheat to the

State of "the creditor's last known address as shown by the debtor's books and records." *Texas, supra,* at 680–681. Finally, if the primary rule fails because the debtor's records disclose no address for a creditor or because the creditor's last known address is in a State whose laws do not provide for escheat, the secondary rule awards the right to escheat to the State in which the debtor is incorporated. These rules arise from our "authority and duty to determine for [ourselves] all questions that pertain" to a controversy between States, *Kentucky* v. *Indiana,* 281 U. S. 163, 176 (1930), and no State may supersede them by purporting to prescribe a different priority under state law.

## III

None of the parties contests the primary rule or the Master's recommendation that "where the state of domicile of an unlocatable entitled recipient is known, through finding a last known address, that state may take custody of the unclaimed distributions." Report of Special Master 56–57 (footnote omitted).[11] The bulk of the abandoned distributions at issue, however, cannot be traced to any identifiable beneficial owner, much less one with a last known address. These funds thus fall out of the primary rule and into the secondary rule. Consequently, under *Texas* and *Pennsylvania,* the debtor's State of incorporation should be entitled to escheat this unclaimed property. The Master's report concludes, first, that the issuer of securities is the relevant "debtor" and, second, that the State in which the debtor's "principal executive offices" are located should be considered the debtor's State. We reject both of these recommendations.

## A

"[W]here the entitled recipient's domicile is undeterminable (no last known address), but the state of domicile of the

---

[11] New York has filed an exception to the Master's application of the primary rule. We address this argument in Part IV below.

originator of the distribution is known," the Master recommended that the originator's State be awarded the right to escheat, "whether or not the originator would have been entitled to receive the funds back in its own right." Report of Special Master 57. Because he construed the use of the terms "debtor" and "creditor" in *Texas* and *Pennsylvania* as a merely "descriptive . . . attempt to identify the relevant parties" rather than "prescriptive legal commands," Report of Special Master 29, the Master defined "debtor" as "the last owner of the funds, in the sense of the last person who had a claim to the funds as an asset that would appropriately be reflected in the net worth of the entity in question," *id.*, at 32. In its first exception, Delaware argues that "the Report's recommendation in this regard does not comport with the ordinary meaning of the words 'debtor' and 'creditor,' is inconsistent with universally-accepted state and common law and with the principles underlying the *Texas* rule, and changes the law in an area where the law should be settled." Exceptions and Brief for Plaintiff Delaware E–4. Delaware also objects to the Master's failure to "ascrib[e] . . . legal relevance to [intermediaries'] status as record security holders," a "fundamental factual error" that effectively treats record owners "as if they were paying agents." *Id.*, at E–5. New York's first exception likewise objects to the Master's use of "the term 'debtor' as 'shorthand' to identify parties with 'debtor attributes' rather than the obligor of the debt." Exceptions of Defendant New York 52. We agree with both States and sustain their exceptions.

We have not relied on legal definitions of "creditor" and "debtor" merely for descriptive convenience. Rather, we have grounded the concepts of "creditor" and "debtor" in the positive law that gives rise to the property at issue. In framing a State's power of escheat, we must first look to the law that creates property and binds persons to honor property rights. "Property interests, of course, are not created by the Constitution," but rather "by existing rules or under-

standings that stem from an independent source such as state law." *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564, 577 (1972). Accord, *e. g., Bishop* v. *Wood,* 426 U. S. 341, 344–347 (1976); *Paul* v. *Davis,* 424 U. S. 693, 710–712 (1976). See also *Barnhill* v. *Johnson,* 503 U. S. 393, 398 (1992) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law"). Furthermore, law that creates property necessarily defines the legal relationships under which certain parties ("debtors") must discharge obligations to others ("creditors").

To define "debtor" as "the last person who ha[s] a claim to the funds as an asset that would appropriately be reflected in [his] net worth," Report of Special Master 32, would convert a term rich with prescriptive legal content into little more than a description of bookkeeping phenomena. Funds held by a debtor become subject to escheat because the debtor has no interest in the funds—precisely the opposite of having "a claim to the funds as an asset." We have recognized as much in cases upholding a State's power to escheat neglected bank deposits. Charters, bylaws, and contracts of deposit do not give a bank the right to retain abandoned deposits, and a law requiring the delivery of such deposits to the State affects no property interest belonging to the bank. *Security Savings Bank* v. *California,* 263 U. S. 282, 285–286 (1923); *Provident Institution for Savings* v. *Malone,* 221 U. S. 660, 665–666 (1911). Thus, "deposits are *debtor obligations* of the bank," and a State may "protect the interests of depositors" as creditors by assuming custody over accounts "inactive so long as to be presumptively abandoned." *Anderson Nat. Bank* v. *Luckett,* 321 U. S. 233, 241 (1944) (emphasis added). Such "disposition of abandoned property is a function of the state," a sovereign "exercise of a regulatory power" over property and the private legal obligations inherent in property. *Standard Oil Co.* v. *New Jersey,* 341 U. S. 428, 436 (1951).

Our rules regarding interstate disputes over competing escheat claims cannot be severed from the law that creates the underlying creditor-debtor relationships. In *Texas* and *Pennsylvania*, our examination of the holder's legal obligations not only defined the escheatable property at issue but also carefully identified the relevant "debtors" and "creditors." See *Texas*, 379 U. S., at 675–676, n. 4; *Pennsylvania*, 407 U. S., at 208–209, 213. In *Pennsylvania*, we noted that Western Union was a "debtor" insofar as it owed contractual duties to two separate creditors. Western Union was obligated not merely to deliver a negotiable draft to the sender's payee; if Western Union could not locate the payee or if the payee failed to claim his money order, the company was bound to make a refund to the sender. *Id.*, at 208–209. Correspondingly, we recognized that the relevant "creditor" might be either a payee or a sender: "the payee of an unpaid draft, the sender of a money order entitled to a refund," or a payee or sender "whose claim has been underpaid through error." *Id.*, at 213 (internal quotation marks omitted).

Moreover, the rules developed in *Texas* and *Pennsylvania* reflect the traditional view of escheat as an exercise of sovereignty over persons and property owned by persons. The primary rule flowed from the common-law "concept of *'mobilia sequuntur personam,'* according to which intangible personal property is found at the domicile of its owner." *Texas, supra,* at 680, n. 10. Accord, *Pennsylvania, supra,* at 217–218 (Powell, J., dissenting). See also *Blodgett* v. *Silberman,* 277 U. S. 1, 10 (1928) ("[I]ntangible personalty has . . . a *situs* at the domicil of the owner"). In recognizing that "a debt is property of the creditor," *Texas, supra,* at 680, the primary rule permits the escheating State to protect the interest of a creditor last known to have resided there. Reasoning that "debts owed by" a holder of unclaimed funds "are not property to it, but rather a liability," we concluded that "it would be strange to convert a liability into an asset when the State decides to escheat." 379 U. S., at 680. Cognizant of the

creditor's status as owner of intangible personal property, we awarded the primary right to escheat to the creditor's State. Conversely, when a creditor's last known address cannot be determined or the laws of the creditor's State do not provide for escheat, the secondary rule protects the interests of the debtor's State as sovereign over the remaining party to the underlying transaction. Unless we define the terms "creditor" and "debtor" according to positive law, we might "permit intangible property rights to be cut off or adversely affected by state action . . . in a forum having no continuing relationship to any of the parties to the proceedings." *Pennsylvania, supra,* at 213 (internal quotation marks omitted). Cf. *Connecticut Mut. Life Ins. Co.* v. *Moore,* 333 U. S. 541, 549–550 (1948) (upholding New York's escheat of unclaimed insurance benefits only "as to policies issued for delivery in New York upon the lives of persons then resident therein where the insured continues to be a resident and the beneficiary is a resident at . . . maturity"). *Texas* and *Pennsylvania* avoided this conundrum by resolving escheat disputes according to the law that creates debtor-creditor relationships; only a State with a clear connection to the creditor or the debtor may escheat. Because the Master failed to identify the relevant "creditors" and "debtors" by reference to that law, we now perform this task.

We hold that intermediaries who hold unclaimed securities distributions in their own name are the relevant "debtors" under the secondary rule of *Texas* and *Pennsylvania.* From an issuer's perspective, the only creditors are registered shareholders, those whose names appear on the issuer's records. Issuers cannot be considered debtors once they pay dividends, interest, or other distributions to record owners; payment to a record owner discharges all of an issuer's obligations. Under §8–207(1) of the Uniform Commercial Code, which is the law of all 50 States and the District of Columbia, "the issuer . . . may treat the registered owner as the person exclusively . . . to exercise all the rights and

powers of an owner." Payment to an intermediary that is the record owner of securities extinguishes any liability the issuer might have to the beneficial owner. U. C. C. § 8–207, comment 1, 2C U. L. A. 341 (1991). The Master acknowledged as much, see Report of Special Master 25, and none of the parties contends otherwise. Instead, an intermediary serving as the record owner of securities is the "debtor" insofar as the intermediary has a contractual duty to transmit distributions to the beneficial owner. Unlike an issuer, which discharges all liabilities upon payment to a record owner, an intermediary remains liable should a "lost" beneficial owner reappear to collect distributions due under a contract with the intermediary. The Master thus erred in equating intermediary banks, brokers, and depositories with the issuers' paying agents, who owe no duty to beneficial owners but rather bear the contractual obligation to "return . . . unclaimed distributions to the issuer after a certain period of time." App. to Report of Special Master B–6. Intermediaries who hold securities in street name or nominee name are the relevant "debtors" because they alone, and not the issuers, are legally obligated to deliver unclaimed securities distributions to the beneficial owners.

### B

The Master's recommended disposition of this case rested on a second major premise: his proposal to locate a corporate debtor in "the jurisdiction of the entity's principal domestic executive offices rather than the state of incorporation." Report of Special Master 49 (footnote omitted). In *Texas* and *Pennsylvania,* however, we explicitly granted the right to escheat under the secondary rule to the State in which the debtor was incorporated. *Texas, supra,* at 682; *Pennsylvania, supra,* at 210–211, 212, 223–224. By the Master's own admission, relying on the location of a debtor's principal executive offices "change[s] [this Court's] longstanding practice." Report of Special Master 50. The Master proposed

this innovation *sua sponte;* no party sought this alteration of our settled law. Delaware excepts to this "[d]epart[ure] from the rule of corporate domicile" as "inconsistent not only with this Court's precedents, but with fundamental principles of jurisprudence defining the relationship between the sovereign and its corporate citizens." Exceptions and Brief for Plaintiff Delaware E–4 to E–5. Finding that the "heavy burden" that attends a request "to reconsider not one but two prior decisions" has not been borne, *Walker* v. *Armco Steel Corp.,* 446 U. S. 740, 749 (1980), we sustain Delaware's exception.

In *Texas,* we considered and rejected a proposal to award the *primary* right to escheat to the State "where [the debtor's] principal offices are located." 379 U. S., at 680. Although we recognized that "this State is probably foremost in giving the benefits of its economy and laws to the company whose business activities made the intangible property come into existence," we rejected the rule because its application "would raise in every case the sometimes difficult question of where a company's 'main office' or 'principal place of business' or whatever it might be designated is located." *Ibid.* Even when we formulated the *secondary* rule, we looked instead to the debtor's State of incorporation. *Id.,* at 682. As in *Texas,* we find that determining the State of incorporation is the most efficient way to locate a corporate debtor. Exclusive reliance on incorporation permits the disposition of claims under the secondary rule upon the taking of judicial notice. Although "a general inquiry into where the principal executive office is located [may] see[m] neither burdensome [n]or complex," Report of Special Master 49, we cannot embrace a "rule leaving so much for decision on a case-by-case basis," *Texas, supra,* at 680. The mere introduction of any factual controversy over the location of a debtor's principal executive offices needlessly complicates an inquiry made irreducibly simple by *Texas'* adoption of a test based on the State of incorporation.

Even if we were to endorse the Master's redefinition of a debtor's location, we doubt that his proposal could fulfill its promise "to distribute the funds [more] fairly among the various jurisdictions." Report of Special Master 50. The Master sought to counteract the inequity he perceived in the happenstance that "the larger, publicly-traded, enterprises that generate the lion's share of the securities distributions . . . are by any standard disproportionately incorporated in one state." *Id.*, at 47. His "principal executive offices" initiative, however, cannot survive independent of his erroneous decision to treat the issuers as the relevant "debtors." Because we have already decided that the intermediaries are the proper debtors under the secondary rule, this change would simply transfer the bulk of the disputed funds from Delaware, where many intermediaries are incorporated, to New York, where many intermediaries have located their principal executive offices. A company's arguably arbitrary decision to incorporate in one State bears no less on its business activities than its officers' equally arbitrary decision to locate their principal executive offices in another State. It must be remembered that we refer to a debtor's State of incorporation only when the creditor's last address is unknown or when the creditor's State does not provide for escheat. When the creditor's State cannot assert its predominant interest, we detect no inequity in rewarding a State whose laws prove more attractive to firms that wish to incorporate.

Precedent, efficiency, and equity all dictate the rejection of the Master's "principal executive offices" proposal. We accordingly adhere to *Texas* and *Pennsylvania* and award the right to escheat under the secondary rule to the State in which the debtor is incorporated.

## IV

We turn, finally, to New York's contention that many of the disputed funds need not be escheated under the second-

ary rule at all. New York concedes that "the creditors of unclaimed distributions" held by depositories and custodian banks "are always unknown." Exceptions of Defendant New York 81. It argues, however, that "reconstruct[ion]" of "the debtor *brokers*' transactions" will lead to "creditor brokers that purchased the underlying securities and were underpaid the distributions." *Id.*, at 80 (emphasis added). Because "the amount of time and resources that would be required to reconstruct the overpayment transactions would be very considerable," however, New York "has suggested the use of statistical sampling to prove that virtually all of the creditor brokers and banks recorded on the books of debtor brokers in New York have New York addresses." *Ibid.*

We overrule New York's exception. As an initial matter, New York's proposal rests on the dubious supposition that the relevant "creditors" under the primary rule are other brokers. We have already held that "creditors" are the parties to whom the intermediaries are contractually obligated to deliver unclaimed securities distributions. Accordingly, to the extent that beneficial owners are the relevant "creditors," New York's exception is inapposite.

Even if we indulge New York's premise that most creditors of New York brokers are in fact other New York brokers, the exception must fail. As the Master correctly observed: "[N]othing in the Court's jurisprudence . . . suggest[s] that New York can prevail by making a statistical showing that 'most' [creditor-brokers'] addresses are in New York." Report of Special Master 67. In *Pennsylvania,* we rejected a proposal practically identical to New York's. In that case, because Western Union's records frequently did not disclose a creditor's identity or last known address, the debtor's State of incorporation stood to "receive a much larger share of the unclaimed funds" under the secondary rule. 407 U. S., at 214. The plaintiff States urged us to define the creditor's residence according to a "presumption

based on the place of purchase." *Ibid.* Like New York's proposal, the rule advocated in *Pennsylvania* would use a statistical surrogate instead of the debtor's records to locate the last known addresses of creditors. That much is clear from the *Pennsylvania* dissent's description of the rejected rule as "a reasonable approximation." *Id.,* at 221 (opinion of Powell, J.). New York may object to the cost and difficulty of culling creditors' last known addresses from brokers' records,[12] but in *Pennsylvania,* we expressly refused "to vary the application of the [primary] rule according to the adequacy of the debtor's records." *Id.,* at 215. And we decline to do so here.

Despite our refusal to adopt New York's proposal for statistical analysis of creditors' addresses under the primary rule, we decline Delaware's invitation to enter judgment against New York on the basis of the Master's findings. Exceptions and Brief for Plaintiff Delaware 85. On remand, if New York can establish by reference to debtors' records that the creditors who were owed particular securities distributions had last known addresses in New York, New York's right to escheat under the primary rule will supersede Delaware's right under the secondary rule. As we noted in *Texas,* "the State of corporate domicile should be allowed to ... retai[n] the property for itself only until some other State comes forward with proof that it has a superior right to escheat." 379 U. S., at 682. Accord, *Pennsylvania,* 407 U. S., at 210–211. If New York or any other claimant State fails to offer such proof on a transaction-by-transaction basis or to provide some other proper mechanism for ascertaining creditors' last known addresses, the creditor's State will not prevail under the primary rule, and the secondary rule will control. *Id.,* at 215.

---

[12] New York and other States could have anticipated and prevented some of the difficulties stemming from incomplete debtor records, for nothing in our decisions "prohibits the States from requiring [debtors] to keep adequate address records." *Pennsylvania,* 407 U. S., at 215.

## V

Only by adhering to our precedent can we resolve escheat disputes between States in a fair and efficient manner. We have repeatedly declared our unwillingness "either to decide each escheat case on the basis of its particular facts or to devise new rules of law to apply to ever-developing new categories of facts." *Texas, supra,* at 679. Accord, *Pennsylvania, supra,* at 215. To craft different rules for the novel facts of each case would generate "so much uncertainty and threaten so much expensive litigation that the States might find that they would lose more in litigation expenses than they might gain in escheats." *Texas, supra,* at 679. If the States are dissatisfied with the outcome of a particular case, they may air their grievances before Congress. That body may reallocate abandoned property among the States without regard to this Court's interstate escheat rules. Congress overrode *Pennsylvania* by passing a specific statute concerning abandoned money orders and traveler's checks, §§ 601–603, 88 Stat. 1525, 12 U. S. C. §§ 2501–2503, and it may ultimately settle this dispute through similar legislation.

We remand this case to the Master for further proceedings consistent with this opinion and for the preparation of an appropriate decree.

*So ordered.*

JUSTICE WHITE, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join, dissenting.

In my view, the Special Master did no violence to our precedents and has a much superior approach and more equitable result than does the Court. I would overrule all of the exceptions to the Special Master's Report, adopt his recommended findings and conclusions, and issue a decree in accordance therewith.