IN THE SUPREME COURT OF THE STATE OF DELAWARE

OVERSTOCK.COM, INC.,     §

§    No. 327, 2019

Defendant Below,     §

Appellant,     §    Court Below: Superior Court

§    of the State of Delaware

v.     §

§    C.A. No. N13C-06-289

THE STATE OF DELAWARE,     §    [CCLD]

§

*ex rel.*     §

§

WILLIAM SEAN FRENCH,     §

§

Plaintiff-Relator Below,     §

Appellees.     §

Submitted: April 29, 2020
Decided: June 24, 2020


Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.


Upon appeal from the Superior Court. **REVERSED**.


Michael P. Kelly, Esquire, Matthew J. Rifino, Esquire, and Hayley J. Reese, Esquire, McCarter & English, LLP, Wilmington, Delaware, and Matthew Wright, McCarter & English, LLP, Esquire, Washington, D.C. for Appellant, Overstock.com, Inc.

Thomas E. Brown, Esquire, Edward K. Black, Esquire, and Stephen G. McDonald, Esquire, Deputy Attorney Generals, Wilmington, Delaware for Appellee, State of Delaware.

Laina M. Herbert, Esquire, and Vivek Upadhya, Esquire, Grant & Eisenhofer, Wilmington, Delaware, for Appellee, William Sean French.


**VAUGHN**, Justice:

The Appellant, Overstock.com, Inc. (Overstock), a Delaware corporation, appeals from a Superior Court judgment awarding the Appellees, Plaintiff-Relator William Sean French and the State of Delaware (Plaintiffs), $22,000 in civil penalties and $7,266,412.94 in treble damages for violations of the Delaware False Claims and Reporting Act (the DFCRA or the Act). Overstock is a retail company that sells a wide range of consumer products online. Plaintiffs allege that Overstock engaged in what they describe as a scam to evade its obligation to escheat balances owed on abandoned gift cards to the Delaware State Escheator. It did so, they allege, by making it falsely appear that its gift cards were held by an Ohio company, not Overstock. It is undisputed that Overstock did not file escheat reports or pay the money value of abandoned gift cards to the Delaware Escheator during the years in question.

The case was tried before a jury on a theory that Overstock violated §1201(a)(7) of the Act in the years 2010 through 2013.[1] During those years, §1201(a)(7) provided that:

> Any person who: [k]nowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government shall be liable for a civil penalty . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.[2]

---

[1] 6 *Del. C.* §1201(a)(7) (2009).
[2] *Id.* In 2013, the statute was amended to provide that

The jury returned a verdict finding that Overstock violated § 1201(a)(7).

Overstock raises several claims on appeal, but we find it necessary to address only one. Overstock contends that the Superior Court misinterpreted the Act and erred by instructing the jury that the knowing failure to file escheat reports when required to do so was no different than actively making a false statement. It contends that the failure to file such reports does not satisfy the Act's requirement that a false record or statement be made or used to avoid, conceal or decrease an obligation to pay money to the Government. It further contends that it did not make or use any false record or statement in connection with gift cards that violated the Act. We agree that the evidence fails to establish the making or use of a false record or statement in violation of the Act. Accordingly, we reverse the judgment of the Superior Court.

## I. FACTS

Delaware requires the holders of abandoned property to file annual escheat reports with the State Escheator and pay or deliver to the Escheator the abandoned

---

> Any person who: [k]nowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government shall be liable . . . .

6 *Del. C.* §1201(a)(7) (2013). The 2013 version has no bearing on this litigation.

3

property described in the report.[3]  Abandoned property is defined as property "against which a full period of dormancy has run."[4]  A full period of dormancy ordinarily means a "full and continuous period of 5 years" during which an owner has "ceased, failed or neglected to . . . assert a right of ownership" over property.[5]  An entity is deemed a "holder" of abandoned property if it has "possession, custody or control of the property."[6]  Where the abandoned property is a debt which has gone unclaimed by a creditor, such as the obligation to honor a gift card bought by a customer, the state having the right to the escheat of such debt is determined according to rules laid down by the United States Supreme Court in a trilogy of cases known as the *Texas* trilogy.[7]  Under those rules, the state having the right to apply

---

[3] 12 *Del. C.* §§ 1199(a), 1201 (2009).  In 2017, Delaware amended its Unclaimed Property Law. *See* 12 *Del. C.* § 1130 *et seq.* (2017).  The amended statute is not applicable to this litigation.

[4] 12 *Del. C.* § 1198(1) (2008).

[5] *Id.* § 1198(9)(a).

[6] *Id.* § 1198(7).

[7] The *Texas* trilogy refers to the U.S. Supreme Court cases of *Texas v. New Jersey*, 379 U.S. 674 (1965), *Pennsylvania v. New York*, 407 U.S. 206 (1972), *superseded by statute as stated in Delaware v. New York*, 507 U.S. 490 (1993), and *Delaware v. New York*, 507 U.S. 490 (1993).  To determine which state has priority over escheatable property, the *Texas* trilogy provides the following analytical framework:

> [f]irst, we must determine the precise debtor-creditor relationship as defined by the law that creates the property at issue.  Second, because the property interest in any debt belongs to the creditor rather than the debtor, the primary rule gives the first opportunity to escheat to the State of "the creditor's last known address as shown by the debtor's books and records."  Finally, if the primary rule fails because the debtor's records disclose no address for a creditor or because the creditor's last known address is in a State whose laws do not provide for escheat, the secondary rule awards the right to escheat to the State in which the debtor is incorporated.

its escheat laws to abandoned gift cards is usually the state of incorporation of the company considered the debtor of the cards.[8]

Because retailers are potentially liable to state escheators for money received in exchange for gift cards that are later abandoned, some were prompted to create special purpose entities known as "giftcos."[9]  In the typical arrangement, the giftco is a subsidiary of the retailer and is created for the express purpose of issuing the retailer's gift cards. The retailer incorporates the subsidiary giftco in a state which exempts gift cards from escheat laws or otherwise has escheat laws that are more favorable to the retailer than those of the retailer's home state of incorporation.[10] The theory is that using the giftco as the issuer of the cards shields the retailer from liability to its home state escheator for abandoned gift cards.

---

*Delaware*, 507 U.S. at 499-500 (internal citation omitted).

[8] *See Delaware*, 507 U.S. at 500.

[9] *See* Diane Green-Kelly, *Unclaimed Property: An Ancient Concept Creating Modern Liabilities*, 32 FRANCHISE L.J. 41, 46 (2012) ("In the early 2000s, many large independent retailers and franchisors created separate so-called giftcos that were incorporated in Virginia and other states that exempted unredeemed gift cards from the escheat requirement.  The separate gift card company's function is to issue gift cards using the retailer or franchise brand name.  Because the gift card company would not record the names and addresses of the consumers that purchased the gift cards, the state of incorporation would have a priority claim to unredeemed gift cards under the second priority rule.  If the state of incorporation exempts unredeemed gift cards from the escheat requirement, the retailer or franchisor is not required to escheat the unredeemed portion of gift cards sold.").

[10] *See State ex rel. French v. Card Compliant LLC*, 2018 WL 4183714, at *2 n.5 (Del. Super. Aug. 29, 2018) ("Under 'giftco' planning structures, a Delaware-incorporated retailer forms a subsidiary single-purpose entity—a 'giftco'—to issue its gift cards and to bear any liabilities associated with the cards.  That retailer's giftco is domiciled in some state that exempts gift card liabilities from escheat.  The retailer then contracts its giftco to sell and redeem its gift cards."); Green-Kelly, *supra* note 8, at 46.

CardFact, Ltd., an Ohio limited liability company, and its affiliates (collectively, CardFact), provided a new twist on the classic giftco. Instead of creating its own subsidiary giftco, a retailer could contract with CardFact to handle its gift card program. In Ohio, the state in which CardFact was organized, abandoned gift cards are not subject to escheat.[11]

In 2006, CardFact's founder, Ted Ziegler, entered into discussions with Overstock to explore whether Overstock would be interested in using CardFact's services. The discussions proved fruitful, and Overstock and CardFact entered into an agreement. The agreement, known as the Card Services Agreement (the CSA), provided that CardFact would handle Overstock's gift card program. Under the terms of the agreement, the CSA was to be governed by Ohio law. Among other things, the CSA provided that CardFact, not Overstock, was the "holder" of the gift cards, and CardFact, not Overstock, would be liable to customers who acquired gift cards for the debt which the gift cards represented.[12] CardFact was authorized to issue and market Overstock's gift cards in exchange for certain licensing and

---

[11] Ohio Rev. Code Ann. § 169.01(B)(2)(d)(i) (West 2019) (excluding gift cards from the definition of "unclaimed funds" if "redeemable only for goods or services).

[12] App. to Opening Br. at A2597 § 2.11 ("Liability During Term. During the Term of this Agreement, CardFact shall be liable to the Cardholders for all unredeemed Cards. It is the intention of the parties that CardFact is the holder of any unclaimed property with respect to any now existing Cards or Cards issued during the Term of this Agreement. The preceding sentence notwithstanding, it is the intention of the Parties that CardFact shall be the legal holder with respect to only those unredeemed Cards for which no applicable statutory dormancy period has run prior to the effective date of this Agreement." (emphasis omitted)).

handling fees and other reimbursements.[13] Overstock undertook to register and record gift card issuances and transactions and periodically report to CardFact certain details, including the cash value of all gift cards issued and the cash value of all gift card redemptions in a reporting period.[14] Overstock agreed to make periodic payments to CardFact consistent with its reports.[15] The CSA also provided that Overstock and CardFact recognized that the gift cards would be used to purchase Overstock's merchandise only.[16] Under the parties' contractual arrangement, Overstock could continue to sell gift cards as it always had with minor modifications, and Overstock would continue to receive the purchase price for the cards.[17]

In 2009, Ziegler sold CardFact to Card Compliant LLC, a Kansas limited liability company. Card Compliant continued to conduct CardFact's business.

Ziegler's brother-in-law, William Sean French, worked for Ziegler at

---

[13] *Id.* at A2593 § 1.01, A2594 § 1.03, A2596 §§ 2.02, 2.03, 2.04.

[14] *Id.* at A2595 § 2.01, A2597 § 2.12.

[15] *Id.* at A2596 §§ 2.05, 2.06, 2.07, 2.08. Overstock was also obligated to pay CardFact a "set-up fee." *Id.* at A2597 § 2.13.

[16] *Id.* at A2595 § 2.01 ("The parties acknowledge that the Cardholders, who acquire the Cards through purchase or otherwise may from time to time, redeem part or all of the Embedded Value of each Card on the Company's website for merchandise only.").

[17] *See id.* at 2037-40. The gift cards, however, would include a statement on the back of the cards to the effect that the card was issued by and represented an obligation of CardFact. *Id.* at A1322, A2039-40, A2628. CardFact also provided Overstock with marketing materials describing how CardFact's arrangement with retailers would work. *Id.* at 2524 (providing that, under the arrangement, "[r]etailer sells and markets gift cards;" "[r]etailer manages cash from gift card sales," and "[n]o change required in gift card processor or operation of program"). CardFact's marketing materials further informed retailers, including Overstock, "[y]ou can use existing vendors for card processing, production, etc.," "[y]our company manages the cash proceeds from gift card sales," and "[y]our company can continue to sell existing gift cards." *Id.* at 2525.

CardFact from 2007 to 2009.  In 2011 he joined Kelmar Associates LLC, the agent with which Delaware contracts to carry out unclaimed property audits on its behalf.

In 2013, French brought this *qui tam* action under the DFCRA against numerous retailers, including Overstock, and Card Compliant and related card service companies.[18]  The State of Delaware intervened.  In an amended complaint, French and the State alleged that agreements like the one between Overstock and Card Compliant were schemes to evade Delaware's escheat laws.  In Count I of the amended complaint, they alleged a violation of 12 *Del. C.* § 1201(a)(7) in that "Defendants knowingly made, used, or caused to be made or used, false statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Government."[19]

In a motion to dismiss the complaint, Overstock contended that it had not made or used a false record or statement to conceal, avoid or decrease an obligation

---

[18] For a more complete discussion of the number and categories of defendants involved in this case, *see State ex rel. French v. Card Compliant, LLC*, 2015 WL 11051006, at *3 (Del. Super. Nov. 23, 2015).

[19] Am. Compl. at 110 ¶414.  Count II of the amended complaint alleged a violation of 12 *Del. C.* § 1201(a)(4), which, at the time relevant to the complaint, attached liability to:

> "[a]ny person who: [h]as possession, custody or control of property or money used or to be used by the Government and, intending to defraud the Government or willfully to conceal the property, delivers or causes to be delivered, less property than the amount for which the person receives a certificate or receipt."

12 *Del. C.* § 1201(a)(4) (2009).  Count II was dismissed by the Superior Court and prior to trial and has played no role in this appeal.

to pay money to the Government.[20] The plaintiffs had a two-fold response to this argument. First, they argued that the CSA itself and Overstock's books and records were themselves a "false record or statement" which satisfied that element of the statute. In addition, they argued that "filing no [escheat] report at all" was the equivalent of "filing a false report."[21]

In denying the motion, the Superior Court rejected Overstock's contention that Plaintiffs had not adequately pleaded that it made or used a false record or statement. It reasoned, "the CSAs, credit memos, invoices, yearly true-ups, and company books, recited in the Complaint, coupled with Defendants' alleged failure to file escheat reports and the State's detailed allegations of a specific scheme, create a strong inference that false reports (including not filing required reports) were submitted to the State."[22]

At trial, the Superior Court provided the jury with the following instruction explaining the meaning of "false record or statement" under § 1201(a)(7) of the Act:

> As to the second element, plaintiffs must prove that Overstock used or made a false record or statement to avoid or decrease an obligation to the State. . . . [M]aking or using . . . a false record or statement in addition to its ordinary meaning includes other activity under Delaware's False Claims and Escheat law. Under that law, the failure to report or causing the absence of an otherwise obligated record or statement that creates a similar false

---

[20] The procedural history of the case is discussed only as it relates to the issue under consideration.
[21] *State ex rel. French v. Card Compliant, LLC*, 2015 WL 11051006, at *5.
[22] *Id.* at *7.

9

impression of the obligation to pay or transmit money or property is no different than actively making a false statement. When the alleged violation of a False Claims Act is based on an alleged failure to report or causing the absence of an otherwise obligated record or statement, it may be referred to as a . . . reverse false claim. A false claim or the lack of a record or statement that creates a false impression is material if it has a natural tendency to influence or be capable of influencing the payment or receipt of money or profit.[23]

During closing arguments, Plaintiffs repeatedly argued that the failure to file an escheat report when required to do so satisfied the "false statement or record" element of the statute.[24] They did not argue in closings that Overstock made any affirmative false statements or submitted any false records to the State.[25]

The jury's verdict against Overstock included a finding that the amount of damages to the State from Overstock's failure to file escheat reports and pay over the balances on abandoned gift cards for the years in question was $2,953,826.40. After considering the parties' post-verdict arguments as to the appropriate amount of a civil penalty and making a stipulated adjustment to the jury's determination of damages, the Superior Court entered the above-mentioned judgment for civil penalties and treble damages under the Act.

---

[23] App. to Opening Br. at A2437-38.
[24] *Id.* at A2303, A2304-05, A2312-13, A2326-27, A2354-55.
[25] *See id.* at A2302-67.

10

In response to the contention Overstock makes on appeal that it never submitted any false record or statement to Delaware concerning abandoned gift cards, Plaintiffs contend that the failure to file an escheat report in the face of a known legal duty to do so is a reverse false claim which violates the Act.[26] Plaintiffs also contend that Overstock made affirmative false statements. They contend that such false statements include its CSA with CardFact in which Overstock purported to be transferring millions of dollars of pre-existing gift card liability to CardFact for nothing, when, as a matter of law, these liabilities could not have been transferred to CardFact. They also contend that Overstock made affirmative false statements in its quarterly and annual filings to the U.S. Securities and Exchange Commission (SEC) when it reported financial results which were inconsistent with CardFact actually being liable to the cardholders for all unredeemed cards. Overstock disputes these contentions.

---

[26] A "reverse false claim" is premised on a person's improper retention of money or property that rightfully belongs to the State. *See State ex re. Higgins v. SourceGas, LLC*, 2012 WL 1721783, at *5 (Del. Super. May 15, 2012) ("Section 1201(a)(7) imposes liability if a person 'knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.' Claims brought under this subsection are termed 'reverse false claims' because 'the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated.'" (emphasis and footnote omitted)).

## II.  STANDARD OF REVIEW

This Court reviews questions of law, including the interpretation of a statute, *de novo*.[27]  We also review *de novo* the Superior Court's decision to give challenged jury instructions.[28]  "In evaluating the propriety of a jury charge, the instructions must be viewed as a whole."[29]  The parties "have the unqualified right to have the jury instructed on a correct statement of the substance of the law."[30]

## III.  DISCUSSION

As discussed above, a person is liable under 6 *Del. C.* § 1201(a)(7) (2009) for making a false claim under the Act, during the years involved here, if the person "[k]nowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."  The elements of the cause of action created by the statute mirror the same federal cause of action as codified at 31 U.S.C. § 3729(a)(7), the federal False Claims Act (the FCA), prior to 2009.  A 2009 amendment to the FCA replaced § 3729(a)(7) with § 3729(a)(1)(G), which broadened the scope of liability for a false claim under federal law.  The amended provision attaches liability to a person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, *or*

---

[27] *City of Wilm. v. Nationwide Ins. Co.*, 154 A.3d 1124, 1127 (Del. 2017).
[28] *Corbitt v. Tatagari*, 804 A.2d 1057, 1062 (Del. 2002) (en banc).
[29] *Id.*
[30] *R.T. Vanderbilt Co. v. Galliher*, 98 A.3d 122, 125 (Del. 2014) (quoting *Koutoufaris v. Dick*, 604 A.2d 390, 399 (Del. 1992) (en banc)).

> *knowingly conceals or knowingly and improperly avoids*
> *or decreases an obligation to pay or transmit money or*
> *property to the Government.*[31]

In 2013, Delaware amended § 1201(a)(7) to include this new language.[32] Under the current version of § 1201(a)(7), a person may be found liable for making a false claim if the person "knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government," as well as any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."[33] We need not analyze the DFCRA as it is currently enacted because the parties have agreed throughout this litigation that the 2009 version of § 1201(a)(7) applies in this case, but we note that it, like the amended FCA, broadens the scope of liability for a false claim.

Because the elements of a false claim under the 2009 version of the DFCRA are modeled on § 3729(a)(7) of the FCA prior to its 2009 amendment, we look to how federal courts have interpreted the scope of liability under that statute.[34] The making or use of a false record or statement in order to conceal, avoid or decrease an obligation to pay money to the government is an essential element of a false claim

---

[31] 31 U.S.C. § 3729(a)(1)(G) (emphases added).
[32] *See* 6 *Del. C.* § 1201(a)(7) (2013).
[33] 6 *Del. C.* § 1201(a)(7).
[34] *See SourceGas*, 2012 WL 1721783, at *4 (acknowledging the "dearth of Delaware authority interpreting the DFCRA" and relying on "the FCA's legislative history, as well as federal case law, for guidance in interpreting the DFCRA").

under the FCA as it existed prior to its amendment in 2009.[35]  To constitute an

actionable reverse false claim under the pre-2009 FCA, "one must, in some way,

falsely assert entitlement to obtain or retain government money or property."[36]  The

false statement or record forming the basis of a reverse false claim must, in some

form, have actually been submitted directly or indirectly to the government in order

for liability to attach.[37]

---

[35] *See, e.g.*, *United States ex rel. Cafasso v. Gen'l Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1056 & n.8 (9th Cir. 2011); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004) (relying on *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1048 (10th Cir. 2004)).

[36] *Gen'l Dynamics C4 Sys., Inc.*, 637 F.3d at 1056.

[37] *See United States ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 255 (3d Cir. 2016) (recognizing that proof of a "false statement or record was a necessary element for reverse FCA liability to attach" prior to the FCA's 2009 amendment, and finding that, in comparison, liability attaches for a reverse false claim under the FCA post-amendment even in the absence of proof of a false statement "since the post-[amendment] FCA specifies that mere knowledge and avoidance of an obligation is sufficient, without the submission of a false record, to give rise to liability"); *Comstock Res., Inc.*, 363 F.3d at 1048 ("Pursuant to § 3729(a)(7), Relators are required to allege that Comstock had 'an existing, legal "obligation to pay or transmit money or property to the Government"' and that Comstock submitted false statements or records to conceal, avoid, or decrease that obligation.  Comstock cannot dispute that it had a legal obligation to transmit royalty payments to the Government.  Relators have alleged that Comstock submitted false reports to avoid its obligation.  We therefore hold that the plain language of § 3729(a)(7) squarely encompasses the fraud on the Government that occurs when a person or entity makes false statements to the United States to avoid transmitting to the Federal Treasury royalties they owe on Indian mineral leases." (citation omitted)).  A predominant view amongst federal circuit courts is that presentment is not an element of § 3729(a)(7), and we agree.  *See, e.g.*, *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1224 n.12 (11th Cir. 2012) ("We note that for a reverse false claim action, presentment of a false claim is not at issue and presentment of a false statement is not required by the statute and thus, does not need to be pled."); *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 473 (6th Cir. 2011) (recognizing that presentment is not required under § 3729(a)(7)); *Gen'l Dynamics C4 Sys., Inc.*, 637 F.3d at 1056 n.8 (recognizing that presentment is not an element of § 3729(a)(7)); *United States v. Bourseau*, 531 F.3d 1159, 1169 (9th Cir. 2008) ("Presentment is not an element in a cause of action under § 3279(a)(7) . . . ."); *see also United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 46 n.7 (1st Cir. 2009) (noting that, while presentment is an element of § 3729(a)(1), presentment is not an element of §§ 3729(a)(2)-(3)); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 189 n.28, 192-93 (5th Cir. 2009) (limiting the presentment requirement to § 3729(a)(1)).

For instance, the submission of an inventory schedule to the government which falsely states that government property in the submitting company's possession is worth substantially less than its true value in order for the company to avoid paying the government the amount truly owed to it for that property is a false record or statement that may form the basis of a reverse false claim.[38] An entity that falsely certifies to the government that it has complied with its contractual obligations to the government but which has actually violated its contractual obligation to remit excess payments to the government also makes a "false record or statement" for purposes of a reverse false claim under the FCA.[39] Similarly, the submission of false cost reports to the government in order to decrease an obligation to refund Medicare overpayments satisfies the "false statement or record" element of a reverse false claim.[40] In contrast, a company's alleged failure to disclose to the government certain of its new technological inventions, when the disclosure of such information could have lessened the government's obligation to pay money, does not satisfy the elements of a reverse false claim, including the element that a false statement or record was used.[41]

---

[38] *See United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1236-38 (11th Cir. 1999) (en banc).
[39] *See Medco Health Solutions, Inc.*, 671 F.3d at 1225-28.
[40] *See Bourseau*, 531 F.3d at 1162-63, 1164-65.
[41] *Gen'l Dynamics C4 Sys., Inc.*, 637 F.3d at 1051-52, 1056.

We find this federal case law instructive in interpreting the DFCRA. In order for Overstock to be found liable for making a reverse false claim under the applicable 2009 statute, it must have submitted a false record or statement that gave the State the impression that Overstock either did not owe the State money or owed the State less money than Overstock was required to pay. The absence of a record or statement cannot form the basis of a reverse false claim under 6 *Del. C.* § 1201(a)(7) (2009).

Overstock's failure to file escheat reports with the State from 2010 to 2013, therefore, is not a "false record or statement" as contemplated by 6 *Del. C.* § 1201(a)(7) (2009). The Superior Court's instruction to the contrary, that the failure to file an escheat report in the face of an obligation to do so was the equivalent of a false record or statement for purposes of a "reverse false claim," was reversible error.

We also reject Plaintiffs' contention that the CSA and its related documents or filings with the SEC satisfy the statute's requirement that a person make or use a false statement or record.[42] Documents that were not submitted in any manner cannot satisfy the element of a "false record or statement" upon which liability under the 2009 version of § 1201(a)(7) is predicated. Neither the CSA nor the SEC filings mentioned were submitted in order to avoid or reduce Overstock's alleged escheat

---

[42] These documents were submitted to the jury for its consideration.

16

obligations.  The plaintiffs have failed to identify any false statement or record made by Overstock that could form the basis of a reverse false claim.

## IV.  CONCLUSION

For the foregoing reasons, we reverse the judgment of the Superior Court.