## *PRELIMINARY PRINT*

## VOLUME 598 U. S. PART 1

### PAGES 115–141

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

FEBRUARY 28, 2023

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published.   Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D.C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

DELAWARE *v.* PENNSYLVANIA ET AL.

ON EXCEPTIONS TO REPORTS OF SPECIAL MASTER

No. 145, Orig.    Argued October 3, 2022—Decided February 28, 2023*

A State may take custody of abandoned property located within its bor-
ders; this process is commonly known as "escheatment."   When aban-
doned property is intangible, however, the lack of a physical location
means that multiple States may have arguable claims.   In these cases,
the question is which States have the right to escheat two financial
products sold by banks on behalf of MoneyGram: Agent Checks and
Teller's Checks (collectively, Disputed Instruments).   Operating much
like money orders, both products are prepaid financial instruments used
to transfer funds to a named payee.   When these prepaid instruments
are not presented for payment within a certain period of time, they are
deemed abandoned, and, currently, MoneyGram applies the common-law
escheatment practices outlined in *Texas* v. *New Jersey*, 379 U. S. 674.
There the Court established the rule that the proceeds of abandoned
financial products should escheat to the State of the creditor's last
known address, *id.*, at 680–681, or where such records are not kept, to
the State in which the company holding the funds is incorporated, *id.*,
at 682.   Because MoneyGram does not, as a matter of regular business
practice, keep records of creditor addresses for the two products at issue
in these cases, it applies the secondary common-law rule and transmits
the abandoned proceeds to its State of incorporation, *i. e.*, Delaware.

   Multiple States invoked this Court's original jurisdiction to determine
whether the abandoned proceeds of the Disputed Instruments are gov-
erned by the Disposition of Abandoned Money Orders and Traveler's
Checks Act (Federal Disposition Act or FDA) rather than the common
law.   The FDA provides that "a money order . . . or other similar writ-
ten instrument (other than a third party bank check)" should generally
escheat to "the State in which such . . . instrument was purchased."   12
U. S. C. § 2503.   This Court consolidated the actions and appointed a
Special Master.   In his initial report, the Special Master concluded that
the Disputed Instruments were covered by the FDA.   Following oral
argument in this Court, he reassessed that decision and issued a second
report, concluding that many of the Disputed Instruments were or could

--------

   *Together with No. 146, Orig., *Arkansas et al.* v. *Delaware*, also on
exceptions to reports of Special Master.

be "third party bank check[s]," which are excluded from the FDA and would generally escheat to Delaware under the circumstances.

*Held*: The Disputed Instruments are sufficiently "similar" to a money order to fall within the FDA. Pp. 127–141.

(a) The parties disagree whether the Disputed Instruments qualify as "money order[s]" or "other similar written instrument[s] (other than a third party bank check)" under § 2503. Because a finding that the Disputed Instruments are similar to money orders would be sufficient to bring the Disputed Instruments within § 2503's reach, the Court need not decide whether they actually *are* money orders. Instead, the Court concludes that the Disputed Instruments are sufficiently "similar" to money orders so as to fall within the "other similar written instrument" category of the FDA. Pp. 127–134.

(1) The Disputed Instruments share two relevant similarities with money orders. First, they are similar in function and operation. Although the FDA does not define "money order," a variety of dictionary definitions contemporaneous with the Act's passage universally define a "money order" as a prepaid financial instrument used to transmit a specified amount of money to a named payee. And this Court's common-law precedents—the backdrop against which the FDA was enacted—are in accord with that definition. In addition, the features that money orders share with the Disputed Instruments, *e. g.*, the fact that they are prepaid, make them likely to escheat, and thus implicate the FDA in the first place.

Second, due to the recordkeeping practices of the entity issuing and holding on to the prepaid funds, abandoned money orders and the Disputed Instruments both escheat inequitably under the Court's common-law rules. The FDA was passed to abrogate this Court's common-law precedents precisely because, for certain instruments like money orders, the entities selling such products often did not keep adequate records of creditor address information as a matter of business practice, which meant that the common law's secondary rule mandating escheatment to the State of incorporation always applied. The FDA prevents this "windfall" to the State of incorporation by instead adopting a place-of-purchase escheatment rule that distributes escheats "as a matter of equity among the several States." §§ 2501(3), 2503. Because Money-Gram does not keep records of creditor addresses as a matter of business practice, application of the common law to the Disputed Instruments would produce the same inequitable result that the FDA is designed to remedy. Pp. 127–132.

(2) Delaware's contrary arguments are unpersuasive. First, the State contends that "money order" refers to a specific commercial prod-

uct labeled as such on the instrument and sold to low-income individuals in small amounts. Unable to present a dictionary definition that cabins the term as described, Delaware attempts to highlight the various ways in which the Disputed Instruments differ from money orders. But Delaware never explains how the differences are relevant to the assessment of similarity for FDA purposes or how such differences undermine the similarities previously outlined above.

In an effort to make those proffered differences more relevant, Delaware asserts that the FDA was actually concerned with dissuading States from adopting costly recordkeeping requirements that would then be passed on to consumers. Delaware argues that the Disputed Instruments are unlike money orders in that the consumers of the Disputed Instruments are typically more capable of absorbing the cost of recordkeeping requirements. The text of the FDA, however, does not support this argument.

Finally, Delaware's suggestion that §2503 be read narrowly to avoid creating surplusage and sweeping in all sorts of unintended financial products goes too far. While there is some merit to Delaware's concern about a broad definition of "money order," this Court need not actually define that term, as it suffices under the FDA that the instruments in question be "similar" to a money order. Pp. 132–134.

(b) Both Delaware and, to some extent, the Special Master, claim that even if the Disputed Instruments qualify as "other similar written instrument[s]" under the FDA, they are also "third party bank check[s]," which are expressly excluded from the FDA. The problem with this argument is that the FDA does not define that phrase. Nor does that phrase have a commonly accepted meaning. Delaware insists that the term means a check signed by a bank officer and paid through a third party. But the State provides no theory as to why it matters to the FDA's escheatment rules whether a financial instrument is or is not paid through a third party. In his Second Interim Report, the Special Master offered the view that "third party bank check" was intended to exclude from the FDA's reach certain well-known financial instruments upon which a bank may be liable, specifically, cashier's checks, certified checks, and teller's checks and thus, to the extent a bank shares liability with MoneyGram on a Disputed Instrument, that product should likewise be characterized as a third party bank check and thereby excluded from the FDA. The Special Master did not explain why Congress would use an amorphous term to describe well-known financial products, while also calling out other well-known instruments, such as money orders, by name in the FDA. Nor did the Special Master explain how bank liability relates to the FDA's escheatment rules in any meaningful way. Bank liability also does not seem to be a tipping point for trigger-

ing an exclusion from the FDA given that banks can be liable on money orders and those products are expressly covered by the statute. Finally, the legislative history of the FDA does not support the contention that the Disputed Instruments constitute "third party bank check[s]." The well-documented circumstances surrounding the insertion of the phrase into §2503 support the conclusion that, whatever the intended meaning of "third party bank check," it cannot be read broadly to exclude from the FDA large swaths of prepaid instruments that escheat inequitably due to the business practices of the company holding the funds. Pp. 135–140.

Exceptions to Special Master's First Interim Report overruled; First Interim Report and order adopted to the extent consistent with this opinion; and cases remanded.

JACKSON, J., delivered the opinion for a unanimous Court with respect to Parts I, II, III, and IV–A, and the opinion of the Court with respect to Part IV–B, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, and KAVANAUGH, JJ., joined.

*Neal Kumar Katyal* argued the cause for Delaware. With him on the briefs were *Katherine B. Wellington, JoAnn Tamila Sagar, Steven S. Rosenthal, Tiffany R. Moseley, John David Taliaferro, Marc S. Cohen,* and *Kathleen Jennings,* Attorney General of Delaware, *Aaron R. Goldstein,* State Solicitor, and *Michelle E. Whalen* and *Anthony J. Testa, Jr.,* Deputy Attorneys General.

*Nicholas J. Bronni,* Solicitor General of Arkansas, argued the cause for Arkansas et al. With him on the brief were *Leslie Rutledge,* Attorney General of Arkansas, and *Vincent M. Wagner,* Deputy Solicitor General, *Steve Marshall,* Attorney General of Alabama, *Mark Brnovich,* Attorney General of Arizona, *Rob Bonta,* Attorney General of California, *Michael J. Mongan,* Solicitor General, *Jonathan L. Wolff,* Chief Assistant Attorney General, *Tamar Pachter,* Senior Assistant Attorney General, *Aimee Feinberg,* Deputy Solicitor General, *Molly K. Mosley,* Supervising Deputy Attorney General, and *Michael Sapoznikow,* Deputy Attorney General, *Philip J. Weiser,* Attorney General of Colorado, *Ashley Moody,* Attorney General of Florida, *Lawrence G. Wasden,*

Attorney General of Idaho, *Todd Rokita*, Attorney General of Indiana, *Tom Miller*, Attorney General of Iowa, *Derek Schmidt*, Attorney General of Kansas, *Daniel Cameron*, Attorney General of Kentucky, *Jeff Landry*, Attorney General of Louisiana, *Brian Frosh*, Attorney General of Maryland, *Dana Nessel*, Attorney General of Michigan, *Austin Knudsen*, Attorney General of Montana, *Doug Peterson*, Attorney General of Nebraska, *Aaron D. Ford*, Attorney General of Nevada, *Wayne Stenehjem*, Attorney General of North Dakota, *Dave Yost*, Attorney General of Ohio, *John M. O'Connor*, Attorney General of Oklahoma, *Ellen F. Rosenblum*, Attorney General of Oregon, *Alan Wilson*, Attorney General of South Carolina, *Ken Paxton*, Attorney General of Texas, *Patrick K. Sweeten*, Associate Deputy Attorney General, and *Ryan D. Walters*, *Sean D. Reyes*, Attorney General of Utah, *Mark Herring*, Attorney General of Virginia, *Bob Ferguson*, Attorney General of Washington, *Patrick Morrisey*, Attorney General of West Virginia, *Joshua L. Kaul*, Attorney General of Wisconsin, and *Karla Z. Keckhaver*, Assistant Attorney General, *Bridget Hill*, Attorney General of Wyoming, *Matthew H. Haverstick*, *Mark E. Seiberling*, *Joshua J. Voss*, *Lorena E. Ahumada*, *Christopher B. Craig*, and *Jennifer Langan*.†

JUSTICE JACKSON delivered the opinion of the Court.*

"Escheatment" is the power of a State, as a sovereign, to take custody of property deemed abandoned. *Texas* v. *New Jersey*, 379 U. S. 674, 675 (1965). In the context of tangible property, the escheatment rule is straightforward: The State in which the abandoned property is located has the power to take custody of it. *Id.*, at 677. But determining which

——————

†Briefs of *amici curiae* were filed in both cases for the American Bankers Association by *Joseph R. Guerra*; and for Unclaimed Property Professionals Organization by *Sara A. Lima* and *Ethan D. Millar*.

*JUSTICE THOMAS, JUSTICE ALITO, JUSTICE GORSUCH, and JUSTICE BARRETT join all but Part IV–B of this opinion.

State has the power to escheat intangible property, which has no physical location, can be complicated, as multiple States may have arguable claims.   See *ibid.*

These original jurisdiction cases require us to decide which States have the power to escheat the proceeds of certain abandoned financial products that MoneyGram Payment Systems, Inc. (MoneyGram), possesses.   Delaware argues that this Court's common-law rules of escheatment apply, which means that the abandoned proceeds should go to Delaware as MoneyGram's State of incorporation.   A collective of other States (Defendant States) argues that a federal statute—the Disposition of Abandoned Money Orders and Traveler's Checks Act (Federal Disposition Act or FDA), 88 Stat. 1525, 12 U. S. C. § 2501 *et seq.*—governs the products at issue, and therefore, as a general matter, the abandoned proceeds should escheat to the State where the products were purchased.   We hold that the FDA covers the instruments in question and thus that they should generally escheat to the State of purchase, pursuant to § 2503.

I

To decide which escheatment rules apply, we must interpret a federal statute that abrogates our precedent.   Thus, we begin with a discussion of this Court's common-law rules for escheatment, followed by a description of the statute that partially displaced those rules.

A

Our first case to address the escheatment of intangible property involved Western Union money orders.   *Western Union Telegraph Co.* v. *Pennsylvania*, 368 U. S. 71, 72 (1961).   At the time, if an individual wanted to safely send money to another person, she could go to a Western Union office and purchase a money order.   *Ibid.*   Such a purchaser would give Western Union the value of the money order plus a fee.   *Ibid.*   Then, Western Union would send a telegraph message

to the company office closest to the intended recipient (or
"intended payee"). *Ibid.* Upon notification, the intended
payee could come to his local Western Union office to collect
a negotiable draft, which he could cash immediately or keep
to cash in the future. *Ibid.*

Sometimes, however, the prepaid draft was never collected
or cashed. *Id.*, at 72–73. At that point, Western Union
would endeavor to issue a refund to the purchaser. *Ibid.*
But if neither the purchaser nor the payee ever collected the
prepayment, Western Union would hold on to the funds until
they were deemed abandoned under state law, at which point
the property could become eligible for escheatment. *Ibid.*;
see also *Pennsylvania* v. *New York*, 407 U. S. 206, 209 (1972).

*Texas* outlined the rules that this Court established for
determining which State has the right to take custody of
such abandoned property. 379 U. S., at 680–682. That case
involved various small debts held by Sun Oil Company, and
multiple States asserted the right to escheat the funds. *Id.*,
at 675–676. To resolve the competing claims, we estab-
lished that, as the primary (default) rule, the proceeds of
abandoned financial products should escheat "to the State of
the creditor's last known address as shown by the debtor's
books and records." *Id.*, at 680–681.[1]

We further acknowledged that there would be times in
which that primary rule would not resolve the escheatment
question, either because the creditors' addresses were un-
known or because the State that is entitled to escheatment
under the primary rule did not have a law empowering it to
take custody of the proceeds. *Id.*, at 682. So we also

---

[1] We have previously described the "debtor" as the entity holding the
prepaid funds equivalent to the value of the money order, for example,
Western Union or MoneyGram, which would be contractually obligated to
pay those funds to certain recipients. *Delaware* v. *New York*, 507 U. S.
490, 503 (1993). The "creditors" can be both the intended payee and,
where the debtor has an obligation to provide a refund if the draft is never
paid out, the original purchaser. *Ibid.*

adopted a secondary rule to apply in those circumstances; namely, that the proceeds should escheat to the debtor's State of incorporation. *Ibid.*

These rules were designed, at least in part, to distribute escheats equitably. We selected escheatment to the State of the creditor's last known address as the default principle because it "tend[ed] to distribute escheats among the States in the proportion of the commercial activities of their residents." *Id.*, at 681. By contrast, escheatment to the State of incorporation of the debtor (our secondary rule) "would too greatly exhalt a minor factor"—*i. e.*, where the debtor chose to incorporate—when the underlying "obligations [were] incurred all over the country." *Id.*, at 680. However, we believed the secondary rule was likely to apply "with comparative infrequency." *Id.*, at 682.

It soon became clear that our primary and secondary escheatment rules were resulting in inequitable distributions, at least with respect to particular instruments, because Western Union largely did not keep records of the addresses of the purchasers or payees of the money orders that the company sold, as a matter of business practice. *Pennsylvania*, 407 U. S., at 211–212, 214. The default rule thus rarely applied in practice, such that proceeds from abandoned Western Union money orders largely escheated to New York, Western Union's State of incorporation, pursuant to the secondary rule. *Id.*, at 212, 214.

Characterizing this "windfall" as unfair, Pennsylvania filed an action that asked us to reconsider *Texas*'s escheatment rules. 407 U. S., at 213–215. Pennsylvania argued that the proceeds from an abandoned money order should escheat to the State where the money order was purchased rather than the State of the creditor's last known address. *Id.*, at 212, 214. This proposal approximated our primary rule under the commonsense assumption that a money order is usually purchased in the State where the creditor lives, but it obviated the need to require additional recordkeeping by the

debtor.   See *id.*, at 214.   While we recognized that Pennsylvania's proposed escheatment rule had "some surface appeal," we declined to modify the primary and secondary rules established in *Texas*, noting that States could solve the problem of inequitable escheatment by requiring Western Union to keep sufficient records.   407 U. S., at 214–215.

B

Congress passed the FDA two years after our decision in *Pennsylvania* to abrogate this Court's common-law escheatment practices and adopt a more equitable rule, at least for some products.   12 U. S. C. § 2501; *Delaware* v. *New York*, 507 U. S. 490, 510 (1993); S. Rep. No. 93–505, pp. 1–3 (1973).

In the text of the statute, Congress declared that, "as a matter of equity among the several States," the States "wherein the purchasers of money orders and traveler's checks reside should . . . be entitled to the proceeds of such instruments in the event of abandonment."   § 2501(3).   Yet, the statute further recognized that such an equitable distribution was not happening under the common-law rules, to the detriment of interstate commerce, because "the books and records of banking and financial organizations and business associations engaged in issuing and selling money orders and traveler's checks do not, as a matter of business practice, show the last known addresses of purchasers of such instruments."   § 2501(1); see § 2501(4).

Notably, instead of keeping our *Texas* default rule and mandating recordkeeping requirements for debtors, as we had suggested in *Pennsylvania*, the FDA addressed the inequitable escheatment problem by establishing a different set of escheatment rules that displaces this Court's primary and secondary escheatment rules whenever applicable.   See § 2503.   It states that "[w]here any sum is payable on a money order, traveler's check, or other similar written instrument (other than a third party bank check) on which a banking or financial organization or a business association is

directly liable," the primary escheatment rule is the place-of-purchase rule that Pennsylvania had proposed in the *Pennsylvania* case. § 2503(1).

Thus, per the FDA, the proceeds of the listed financial instruments escheat to the State of purchase upon abandonment, so long as purchase-location information is known and that State has enacted laws empowering it to take custody of those proceeds. *Ibid.*[2] The text of the FDA also explains why the inequitable escheatment problem was handled in this fashion rather than by adopting a recordkeeping requirement for debtors holding on to abandoned funds. See § 2501(5) (observing that "the cost of maintaining and retrieving addresses of purchasers of money orders and traveler's checks is an additional burden on interstate commerce" that is unnecessary "since it has been determined that most purchasers reside in the State of purchase of such instruments").

## II

### A

Although the telegraphic aspect of Western Union's money order business has fallen into disuse, money orders are still

---

[2] In full, the primary escheatment rule of the FDA states:

"Where any sum is payable on a money order, traveler's check, or other similar written instrument (other than a third party bank check) on which a banking or financial organization or a business association is directly liable—

"(1) if the books and records of such banking or financial organization or business association show the State in which such money order, traveler's check, or similar written instrument was purchased, that State shall be entitled exclusively to escheat or take custody of the sum payable on such instrument, to the extent of that State's power under its own laws to escheat or take custody of such sum." § 2503.

Subsections (2) and (3) adopt alternative rules that apply when there is insufficient information about where the instrument was purchased, and/or when the State of purchase does not have laws permitting the escheatment of such property. In those circumstances, the abandoned proceeds from covered instruments escheat to the State where the company holding the funds has its principal place of business. §§ 2503(2)–(3).

sold today for the same purpose: to safely transmit funds to an intended payee.[3]   Many banks have outsourced the issuance and handling of these kinds of prepaid financial instruments to businesses such as MoneyGram.

The parties have identified four MoneyGram products as relevant to this litigation.   MoneyGram calls these financial instruments "Retail Money Orders," "Agent Check Money Orders," "Agent Checks," and "Teller's Checks."   All of these instruments are products that MoneyGram creates and markets but that are sold to customers by another entity (either a retail location or bank) on behalf of MoneyGram.

As a general matter, these four MoneyGram products operate in the same manner.   The purchaser prepays the face value of the instrument, plus any fee, and MoneyGram holds the proceeds (which have been sent to them by the seller entity) until the intended payee presents the instrument for payment.   In addition, as a matter of business practice, MoneyGram keeps only limited records about transactions concerning these products.   The seller entity transmits information to MoneyGram that identifies where the product was sold, among other things, but the seller does not include in the information given to MoneyGram the identity or address of the purchaser or payee (even if the seller collects that information).

The heart of the instant dispute relates to how Money-Gram handles the abandoned proceeds of these products. MoneyGram considers two of the four products—Retail Money Orders and Agent Check Money Orders—as falling within the scope of the FDA, so it gives the abandoned proceeds of those particular instruments to the States of purchase in accordance with § 2503.   But MoneyGram treats

_____

[3] In addition to being a safe alternative to cash for transmitting money, money orders and similar prepaid instruments have an advantage over standard checks in that, because they are prepaid, they do not depend on the purchaser having sufficient funds in her bank account (in ordinary parlance, they cannot "bounce").

Agent Checks and Teller's Checks (collectively, the Disputed Instruments) as governed by the common law instead of the FDA. Because MoneyGram does not keep records of creditor addresses for these products, MoneyGram applies the secondary rule of *Texas* and gives the abandoned proceeds of those particular instruments to its State of incorporation, Delaware.

B

After an audit of MoneyGram's escheatment policies, Pennsylvania and Wisconsin filed separate lawsuits challenging Delaware's escheatment of the abandoned proceeds of Agent Checks and Teller's Checks. Invoking this Court's original jurisdiction to decide controversies between States, Delaware moved to file a bill of complaint against Pennsylvania and Wisconsin. Arkansas, acting on behalf of itself and several other States, filed a separate motion for leave to file a bill of complaint. We consolidated the actions and appointed a Special Master.

The Special Master bifurcated the proceedings into liability and damages phases. The first phase (to which the current dispute pertains) focuses solely on which State or States have priority to take custody of the proceeds from Money-Gram Agent Checks and Teller's Checks upon abandonment. At the second phase, the Special Master will analyze any damages. The parties filed cross-motions for summary judgment on the issue of liability.

In July 2021, the Special Master issued a First Interim Report that concluded that the Disputed Instruments were covered by the FDA. Delaware filed exceptions to that report. Then, after we had considered the parties' briefs and held oral argument, the Special Master announced that our proceedings had caused him to reassess his conclusions. He subsequently issued a Second Interim Report that concluded that many of the Disputed Instruments were or could be "third party bank checks" and would thereby be excluded from the FDA, which means that, when abandoned, they

would generally escheat to Delaware under the common law. Both parties submitted exceptions to the Special Master's Second Interim Report.

## III

The parties are at odds over whether the Disputed Instruments qualify as "money order[s]" or "other similar written instrument[s] (other than a third party bank check)" within the meaning of the FDA, §2503—a determination that, for present purposes, establishes whether the FDA or the common law governs their escheatment when abandoned. We conclude that the Disputed Instruments are covered by the FDA because they are "other similar written instrument[s]," and neither Delaware nor the Special Master has convinced us that they are "third party bank check[s]." *Ibid.*

## A

Because the plain text of the FDA applies to not only money orders and traveler's checks but also written instruments that are "similar" to those financial products, *ibid.*, we need not determine whether the Disputed Instruments *are* money orders; a finding that they are *similar* to money orders is sufficient to bring them within the reach of the statute (so long as they are not third party bank checks).[4] We determine what "similar" entails in light of the FDA's "text and context," *Southwest Airlines Co.* v. *Saxon*, 596 U. S. ——, —— (2022), not in the abstract. And in these particular cases, the Disputed Instruments share two relevant similarities with money orders. Those instruments operate in the same manner as money orders do (as defined by contempora-

---

[4] The parties agree that the Disputed Instruments are not traveler's checks, which are a type of prepaid financial product characterized by a double signature: the purchaser signs once when purchasing the instrument and then again when redeeming it. Accordingly, although traveler's checks share the characteristics outlined *infra*, at 128–131, for simplicity's sake, we focus on the similarities between money orders and the Disputed Instruments, in the context of §2503, for purposes of this opinion.

neous dictionaries and our prior escheatment cases), and they also implicate the one feature of money orders that the text of the FDA explicitly identifies, insofar as the Disputed Instruments escheat inequitably solely to one State under our common-law rules due to the business practices of the company holding the funds.

First, the Disputed Instruments are similar to money orders in function and operation. The FDA does not define a "money order," so the core features of that instrument are gleaned from a consideration of the "'ordinary, contemporary, common meaning'" of the term. *Sandifer* v. *United States Steel Corp.*, 571 U. S. 220, 227 (2014) (quoting *Perrin* v. *United States*, 444 U. S. 37, 42 (1979)). The parties cite a variety of contemporaneous dictionary definitions and encyclopedia descriptions for the term, and, at the most basic level, a money order is universally defined as a prepaid (or "purchased") financial instrument used to transmit money to a named payee.[5] Some of the dictionaries further indicate that a money order involves a "specified sum of money." Webster's Seventh New Collegiate Dictionary 547 (1972); see also American Heritage Dictionary 847 (1969) ("a specified amount of money").

These features—*i. e.*, prepayment of a specified amount of money to be transmitted to a named payee—generally accord with how we described the Western Union money orders at issue in our prior escheatment cases. See *Pennsylvania*, 407 U. S., at 208; *Western Union Telegraph Co.*, 368 U. S., at 72. And the FDA was enacted against the backdrop of the

---

[5] See, *e. g.*, Black's Law Dictionary 907 (5th ed. 1979); Glenn G. Munn's Encyclopedia of Banking and Finance 581 (rev. 7th ed. 1973); Webster's Seventh New Collegiate Dictionary 547 (1972); 15 Compton's Encyclopedia and Fact-Index 430 (1970); American Heritage Dictionary 847 (1969); Black's Law Dictionary 1158 (rev. 4th ed. 1968). While these sources do not use the term "prepaid," they describe a prepaid financial instrument because they define a money order as an instrument "purchased" by one party in order to transmit money to another party.

common law as set forth in those cases; indeed, it abrogates the common-law escheatment rules that we adopted in those cases. The statute is naturally read to reflect the same basic conception of the term "money order" that we addressed in those precedents.

The operation of the FDA further confirms the relevance of the prepayment feature of a money order for the purpose of assessing the similarity of the Disputed Instruments. The FDA plainly regulates the escheatment of abandoned financial products, and when financial instruments are prepaid, the likelihood of their abandonment (and thus the potential for escheatment) increases, as the holder of the proceeds of such instruments has possession of the prepaid sums of money if the instruments are never collected or presented for payment. See *Pennsylvania*, 407 U. S., at 208. Thus, the FDA naturally applies to prepaid instruments, such as money orders, given that those instruments are of a type likely to implicate the FDA's escheatment rules. And Delaware does not dispute that, just like money orders, the Disputed Instruments are prepaid written financial instruments used to transmit money to intended payees.

Second, the Disputed Instruments are similar to the "money orders" that the FDA targets because they inequitably escheat in the manner that the text of the FDA specifically identifies as warranting statutory intervention. Just as with the money orders in *Pennsylvania*, the company holding the proceeds of the Disputed Instruments (Money-Gram) does not keep adequate records of creditor addresses as a matter of business practice. And the FDA abrogates this Court's escheatment precedents on this very basis. See §§2501, 2503. Consequently, the inherent characteristics of money orders are not the only relevant point of similarity between money orders and the Disputed Instruments; in addition, they both would otherwise escheat inequitably under the secondary common-law rule due to the business practices of the company holding the funds.

The context in which the FDA arises underscores the meaningfulness of this similarity. Our common-law rules were permitting inequitable escheatment (insofar as our primary rule mistakenly relied on the assumption that the holders of such instruments regularly collected creditors' address information), and the statute that Congress enacted in the wake of our *Pennsylvania* ruling details the inequitable escheatment problem. Thus, the FDA regulates "money orders" (however that term is ordinarily defined) not just for the sake of regulating those particular financial instruments, but because inequitable escheatment occurs under our common-law rules if financial instruments do not have address information that can facilitate distribution to the State of entitlement when they are abandoned, and the entities issuing and selling money orders often do not keep adequate records. The lack of related creditor address information was a key feature of the money orders that we evaluated when we were asked to revisit our common-law escheatment rules in *Pennsylvania*, 407 U. S., at 214. So it should come as no surprise that it is likewise a key feature of the statute that Congress enacted to displace our common-law rules.

The inadequate-recordkeeping feature of money orders is also derived from the text of the FDA itself. The statute references both our observation in *Texas* that, "as a matter of equity," the proceeds of abandoned intangible property should be spread "among the several States," §2501(3), and *Pennsylvania*'s subsequent recognition that "the proceeds of such instruments are not being distributed to the States entitled thereto," §2501(4). The FDA explains that this inequity was occurring *because* "the books and records of banking and financial organizations and business associations engaged in issuing and selling money orders and traveler's checks do not, as a matter of business practice, show the last known addresses of purchasers of such instruments."

Opinion of the Court

§ 2501(1). The operative provision of the statute (§ 2503) then adopts the precise alternative rule of escheatment that Pennsylvania suggested in the face of inequitable escheatment caused by a company's business practices.

In short, the FDA's text provides a solution for the problem of the inequitable distribution of escheats, and that solution expressly eschews requiring entities like Western Union to keep adequate records. See §§ 2501(5), 2503. Inadequate recordkeeping is thus highly relevant to the interpretive question of when the FDA, rather than the common law, should apply to the escheatment of the intangible property at issue.[6]

It is uncontested that the Disputed Instruments share the inadequate recordkeeping feature of money orders that the FDA identifies. See § 2501(1). Therefore, if the common law were to apply to the Disputed Instruments, then the abandoned proceeds would escheat inequitably solely to the

_____

[6] To be sure, the parties and the Special Master conceive of the interpretive question before us as how to define the statutory term "money order," or whether the Disputed Instruments look enough like a money order to fall within the statute.   That is, indeed, one way to view the task at hand. But the text and history of the FDA also suggest an alternative framing. Against the backdrop of the operation of our common-law rules and in light of Congress's effort to abrogate them, the interpretive question becomes *when* should the FDA, rather than the common law, apply to particular abandoned intangible property (here, the Disputed Instruments). And the statute's text suggests at least a partial answer: when "the books and records of banking and financial organizations and business associations engaged in issuing and selling" the instruments at issue "do not, as a matter of business practice, show the last known addresses of purchasers of such instruments," such that, absent application of the FDA, the products would not be distributed "as a matter of equity among the several States."   §§ 2501(1), (3), (4).   This answer follows not only from the FDA's codified findings, but also from § 2503, insofar as the text applies both to instruments that can be defined as "money orders" (in light of their inherent features) and also to instruments that are "similar" to money orders for escheatment purposes.

State of incorporation, just like the money orders expressly referenced in the statute.[7]

## B

Delaware's various arguments as to why the Disputed Instruments should not qualify as "other similar written instrument[s]" within the meaning of §2503 are unpersuasive.

First up in Delaware's attempt to distinguish the Disputed Instruments from money orders for FDA purposes is its contention that the term "money order" in the FDA refers to a specific commercial product that is labeled "money order" by the seller and is generally sold in low values to low-income individuals as a substitute for ordinary personal checks. Delaware does not point to any dictionary that includes those additional attributes in its definition of "money order," nor do any of our prior cases that describe Western Union money orders mention such features. See *Pennsylvania*, 407 U. S., at 208–209; *Western Union Telegraph Co.*, 368 U. S., at 72–73. Moreover, while Delaware offers two encyclopedia entries that suggest money orders are "especially helpful to persons who do not have checking accounts,"[8] neither source says that the typical or intended user is, itself, an attribute of a money order.

Delaware also tries to highlight various ways in which the Disputed Instruments can be said to differ from money orders, as Delaware describes them, including differences with respect to face values and customer use. But Delaware never explains why those purported differences are relevant to our assessment of similarity for FDA purposes. Since

---

[7] Indeed, the facts of these very cases reflect the inequitable escheatment dynamic that is at the heart of the FDA: According to the Defendant States, Delaware took $250 million between 2002 and 2017 pursuant to the common law's escheatment rules with respect to Disputed Instruments that were purchased across the Nation, whereas, if the FDA applied, that State would have been entitled to only about $1 million.

[8] 15 Compton's Encyclopedia and Fact-Index, at 430; see also Glenn G. Munn's Encyclopedia of Banking and Finance, at 581.

money orders and the Disputed Instruments are comparators that are not identical, they are likely to be different in *some* respect. The real question is which differences and similarities matter. And none of the differences Delaware identifies relates to the statutory text or ordinary meaning of a money order, nor do they otherwise undermine the analysis of similarity we outlined above.

Undaunted, Delaware attempts to make the differences it identifies seem more material by proffering an alternative vision of the FDA. In this regard, Delaware asserts that the FDA was *really* an effort to dissuade States from adopting costly recordkeeping requirements, the costs of which might then be passed along to low-income consumers. Its argument is that, because the Disputed Instruments are, when compared to money orders, generally larger value instruments that are typically purchased by consumers who can more easily absorb any additional recordkeeping-related costs, those products simply do not implicate the FDA's core (cost-related) concerns and are thus not "similar" to money orders.

But the text of the FDA bears no relationship to Delaware's cost argument. Indeed, the statute says absolutely nothing about the rising costs of money orders for low-income individuals. See §2501. "[T]he cost of maintaining and retrieving addresses of purchasers of money orders and traveler's checks" is only mentioned to explain why a mandatory recordkeeping option (which we had suggested in *Pennsylvania*, 407 U. S., at 215) was not selected as the statutory solution to the inequitable escheatment problem that the FDA plainly addresses. §2501(5).

Nor does it matter that there would be no inequitable escheatment with respect to the Disputed Instruments if MoneyGram did not factor into the equation, as Delaware maintains. In this regard, Delaware argues that the Disputed Instruments do not implicate the concerns underlying the FDA because the banks that sell the Disputed Instru-

ments generally *do* keep adequate records, and therefore States can avoid the escheatment problem by passing laws requiring those banks to transmit their records to Money-Gram and requiring MoneyGram to keep those records. But the FDA regulates escheatment, so it is the recordkeeping practices of the entity holding the funds that is relevant. Here, that entity is MoneyGram, not the banks. Money-Gram has the recordkeeping practices identified as warranting intervention through the FDA, see § 2501(1), and the statute contains a solution to the escheatment problem that MoneyGram's ordinary business practices cause, see § 2503.

Finally, Delaware suggests that § 2503 *must* be read narrowly in order to avoid both creating surplusage and sweeping in all sorts of financial products that Congress did not intend to cover. This goes too far. Although Delaware argues, with some merit, that broadly defining a "money order" as a prepaid instrument used to transmit money to a named payee would render the statute's separate references to "traveler's checks" and "other similar written instruments" superfluous, we need not define "money order" in order to conclude that the FDA applies to the Disputed Instruments, since it suffices that the instruments in question be "similar" to a money order; they need not share its definition. And if "other similar written instrument" is interpreted with reference to both the inherent qualities of a money order and also the recordkeeping concern that the FDA expressly identifies in the text, as discussed above, then the scope of the statute is properly cabined.[9]

---

[9] It is true that, so interpreted, the status of a particular category of instrument as falling within or outside of the FDA's scope could shift if the company in possession of the funds changes its regular or ordinary business practices. But, given this unusual statute, that is not an anomalous outcome. Both Congress (in the text of the FDA) and this Court (in our precedents) have indicated a preference for the equitable distribution of escheats, and our common-law rules can result in equitable escheatment if the business practices of the company possessing the funds suffice. The FDA is a recognition that, sometimes, our common-law rules do not

Opinion of the Court

## IV

Delaware argues that even if the Disputed Instruments qualify as "other similar written instrument[s]" within the meaning of §2503 they are also "third party bank check[s]" and, as such, are expressly excluded from the FDA.[10] The Special Master, too, ultimately adopted a version of this argument; in his view, the "third party bank check" exemption applies to any Disputed Instrument on which a bank is liable (in addition to MoneyGram).[11] Neither Delaware nor the Special Master has provided a persuasive reason for concluding that the Disputed Instruments are "third party bank check[s]" within the meaning of the FDA, and the drafting history of the statute further confirms that the sweep of that language is not as broad as the definitions that Delaware and the Special Master have offered. Therefore, as explained below, we do not accept the contention that the Disputed Instruments are

achieve that outcome, *i. e.*, it is the equivalent of a statutory "Band-Aid" if our common-law rules fail. In other words, the FDA is a statutory fix that need only kick in when, as a matter of business practice, the company holding the funds does not generally collect the relevant address information, such that inequitable escheatment occurs. The text and context of the FDA—and especially the phrase "other similar written instrument"—connote that flexibility and do not suggest that the statute only and exclusively applies to a static category of products.

[10] The Special Master concluded that the "third party bank check" exemption modifies only "other similar written instrument" and does not modify the terms "money order" or "traveler's check." Delaware does not challenge this conclusion.

[11] When they appeared before the Special Master, the parties and experts disagreed on the meaning of "liability," and no one has proffered an agreed-upon definition to this Court. Before us, Delaware does not dispute the Special Master's conclusion that MoneyGram is "directly liable" on the Disputed Instruments. When referencing a bank's liability on a MoneyGram product, it appears that the Special Master was using the term to describe a situation where a bank—as opposed to only MoneyGram—also has an obligation to pay the prepaid instrument upon proper presentment.

carved out of the statute per the "third party bank check" language.

## A

First, however, a caveat: We readily admit that discerning the meaning of "third party bank check" in §2503 is tricky, because the FDA does not define that phrase, and, as far as we can tell, it does not have an "ordinary, contemporary, common meaning." *Sandifer*, 571 U. S., at 227. The parties have not pointed to any contemporary legal or financial source that defines that precise term. And the FDA's "third party bank check" language confounded all three experts retained in these cases, each of whom agreed that it has no traditional meaning in either the legal or the financial realms. Notably, the Special Master valiantly attempted to bring clarity to this term, adopting three different definitions of "third party bank check" over the course of this litigation. Ultimately, between the parties and the Special Master, we have been offered at least six disparate definitions of the term.[12]

In the midst of this uncertainty, Delaware insists that the term "third party bank check" means a check signed by a bank officer and paid through a third party. Not surprisingly, that definition fits the Disputed Instruments like a glove, given that they are signed by bank employees and then ultimately paid through MoneyGram, a nonbank third party, when presented. But Delaware provides no support whatsoever for the conclusion that this is what "third party bank check" means in the FDA context. And, indeed, Delaware's own expert disagreed with that definition for FDA purposes. Delaware also has no theory as to why it matters

---

[12] Those definitions are: an ordinary (nonprepaid) check; a check sold at a bank and paid through a third party such as MoneyGram; a check issued at a bank indorsed to a third party; a check on which a bank is liable that was issued at the instance of a third party; a check on which a bank is liable regardless of whether a third party is involved; a check which is drawn on (and only drawn on) bank accounts.

to the escheatment rules that the statute adopts whether a financial instrument is or is not paid through a third party like MoneyGram. Thus, we are hard pressed to agree that "third party bank check" means what Delaware says.

The Special Master's analysis fares no better. In his Second Interim Report, the Special Master offered a potential definition of "third party bank check" that relies on the view that the phrase was intended to exclude from the FDA's reach certain financial instruments that were well known at the time of the statute's enactment but were not expressly mentioned in the statute—specifically, cashier's checks, certified checks, and teller's checks. According to the Special Master, a significant feature of those particular financial instruments at the time of the FDA's enactment was that a bank was liable on those instruments. Therefore, according to the Special Master, insofar as a bank is directly liable on some of the Disputed Instruments (in addition to Money-Gram), any such MoneyGram product is a "bank check" that should be deemed to fall within the "third party bank check" exception for purposes of the FDA.

We detect multiple problems with the Special Master's reasoning. For one, the Special Master did not explain why the statute uses the amorphous phrase "third party bank check" to capture specific financial instruments that, according to the Special Master, were well known at the time of the enactment of the statute. Congress called out other well-known instruments—money orders and traveler's checks—by their names in the text of the FDA. One would reasonably expect it to have done the same for cashier's checks, certified checks, and teller's checks.[13]

The Special Master also failed to provide an adequate explanation for why bank liability relates in any meaningful way to the escheatment rules that the FDA adopts. That

---

[13] We are not opining today as to whether the FDA applies to cashier's checks, certified checks, or non-MoneyGram teller's checks because the dispute before us does not concern those products.

explanation seems crucial because the parties appear to agree that banks can be liable on money orders themselves, and, as previously explained, far from being excluded, money orders are expressly covered items in this statute.   This incongruity makes it hard to conceive of the bank-liability attribute as the tipping point for whether a financial instrument qualifies as a "third party bank check" for FDA purposes.   Similarly, if we were to agree with the Special Master that bank liability is dispositive of a "third party bank check" designation, then presumably *any* draft on which a bank is liable would fall outside of the FDA—a result that reads the term "third party" out of the statute.

The Special Master's reasoning further fails to account for the nature of the Disputed Instruments, which do not appear to qualify as "bank checks," at least not in the traditional sense of that word.   According to the parties, a "bank check" is a check "drawn" on a bank's own account or *by* a bank and *on* a bank (either the same bank or another).[14] That does not describe the Disputed Instruments, which are drawn on MoneyGram's account, not a bank's account.

Consequently, nothing in the reasoning provided by Delaware or the Special Master persuades us that the Disputed Instruments, which are otherwise "similar" to money orders for FDA purposes, should be deemed "third party bank checks" within the meaning of § 2503.

### B

Nor does the legislative history support Delaware's contention that the Disputed Instruments constitute "third party bank checks."   "Those of us who make use of legislative history believe that clear evidence of congressional in-

---

[14] See L. Lawrence, Making Cashier's Checks and Other Bank Checks Cost-Effective: A Plea for Revision of Articles 3 and 4 of the Uniform Commercial Code, 64 Minn. L. Rev. 275, 278 (1980); G. Wallach, Negotiable Instruments: The Bank Customer's Ability To Prevent Payment on Various Forms of Checks, 11 Ind. L. Rev. 579, 584 (1978).

tent may illuminate ambiguous text." *Milner* v. *Department of Navy*, 562 U. S. 562, 572 (2011). In the instant situation, while the meaning of the phrase "third party bank check" is subject to myriad alternative definitions and is generally unknown, the phrase was inserted into §2503 under well-documented circumstances. And those circumstances further support the conclusion that, whatever "third party bank check" is meant to mean, the Disputed Instruments are not exempted from the FDA under that provision, as Delaware maintains.

Specifically, during the time in which Congress was mulling a draft of the FDA's provisions, it solicited the views of the Treasury Department, and the agency's general counsel responded. He wrote a letter stating that, although he did not object to the adoption of the bill's escheatment rules, he "believe[d] the language of the bill [was] broader than intended by the drafters." S. Rep. No. 93–505, at 5 (Letter from E. Schmults). According to the letter, agency counsel was concerned, in particular, that the phrase " 'money order, traveler's check, or similar written instrument on which a bank or financial organization or business association is directly liable' " could be interpreted to cover " 'third party payment bank checks.' " *Ibid.* Thus, he recommended excluding "third party payment bank checks" from the FDA, *ibid.*, and Congress subsequently adopted this recommendation, dropping the suggested word "payment" in the process, *id.*, at 6; see also §2503.

Reliable sources indicate that the "third party bank check" language was not supposed to be a significant addition. The Senate Report described it as a mere "technical" alteration. *Id.*, at 6; see also 120 Cong. Rec. 4528 (1974) (statement of Comm. Chairman Sen. Sparkman referring to the insertion of the language as a "minor" change). Thus, that statutory phrase is reasonably viewed as merely clarifying the intended initial scope of coverage (*i. e.*, as an effort to better demarcate the boundaries of a statute that regulates es-

cheatment of "money order[s], traveler's check[s], [and] other similar written instrument[s]," §2503), rather than as an express exemption that accepts that items of this nature would otherwise qualify for regulation under the terms of the statute and specifically undertakes to carve them out.

In any event, given the history and text of the FDA, it would be strange to interpret the "third party bank check" language to exempt from the statute entire swaths of prepaid financial instruments that are otherwise similar to money orders in that they operate in generally the same fashion and would likewise escheat inequitably pursuant to the common law due to the business practices of the company holding the funds. At the very least, reading the exemption that broadly would imbue "third party bank check" with a meaning that far surpasses a "technical" change. And it would also risk rendering largely ineffectual the FDA's framework for displacement of the common law, as necessary, to ensure equitable escheatment.

\*          \*          \*

When a financial product operates like a money order—*i. e.*, when it is a prepaid written instrument used to transmit money to a named payee—and when it would also escheat inequitably solely to the State of incorporation of the company holding the funds under our common-law rules due to recordkeeping gaps, then it is sufficiently "similar" to a money order to fall presumptively within the FDA. Such is the case with the Disputed Instruments. And nothing in the parties' arguments, the Special Master's Second Interim Report, or the record in these cases persuades us that the Disputed Instruments should be deemed "third party bank checks."

Accordingly, we adopt the Special Master's recommendations in the First Interim Report, along with his initial proposed order, to the extent they are consistent with this opin-

Opinion of the Court

ion.[15] We also overrule Delaware's exceptions to the First Interim Report and remand this matter to the Special Master for further proceedings consistent with this opinion.[16]

*It is so ordered.*

Page Proof Pending Publication

---

[15] Because we decline to adopt the Special Master's Second Interim Report, we need not address the Defendant States' argument that we should not entertain the Second Interim Report.

[16] In light of our conclusions in these cases, Pennsylvania's alternative request that we reconsider the common-law escheatment rules is moot.

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports. The revised pagination makes available the official United States Reports citation in advance of publication. The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court. A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus. Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation. The following additional edits were made:

p. 115, line 19, "this case" is changed to "these cases"